<pre>
 1                    UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT OF CALIFORNIA
 2                   WESTERN DIVISION - LOS ANGELES

 3

 4   DONNA WALKER, et al.,      )   Case No. CV 18-857-MRW
                                )
 5         Plaintiffs,          )   Los Angeles, California
                                )   Wednesday, November 20, 2019
 6             v.               )   9:45 A.M. to 11:39 A.M.
                                )
 7   CITY OF LOS ANGELES,       )
     et al.,                    )
 8                              )
           Defendants.          )
 9   _____)

10

11

12                     TRANSCRIPT OF PROCEEDINGS
13            BEFORE THE HONORABLE MICHAEL R. WILNER,
                  UNITED STATES MAGISTRATE JUDGE.
14

15

16   Appearances:              See Page 2

17   Deputy Clerk:             Veronica Piper

18   Court Reporter:           Recorded; CourtSmart

19   Transcription Service:    JAMS Certified Transcription
                               16000 Ventura Boulevard #1010
20                             Encino, California  91436
                               (661) 609-4528
21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
</pre>

1  APPEARANCES:

2

3  For the Plaintiffs:        McMurray Henriks LLP
                              By:  YANA G. HENRIKS
4                             811 Wilshire Boulevard, Suite 1640
                              Los Angeles, California  90017
5                             (323) 931-6200
                              yhenriks@law-mh.com
6

7  For the Defendants:       Los Angeles City Attorney's Office
                              By:  HASMIK J. BADALIAN COLLINS
8                             City Hall East
                              200 North Main Street, 6th Floor
9                             Los Angeles, California  90012
                              (213) 978-8722
10                            Hasmik.collins@lacity.org

11                            Arena Hoffman LLP
                              By:  ALEX W. CRAIGIE
12                            220 Montgomery Street, Suite 905
                              San Francisco, California  94104
13                            (323) 652-9451
                              acraigie@arenahoffman.com

14

15

16

17

18

19

20

21

22

23

24

25

LOS ANGELES, CALIFORNIA, WEDNESDAY, NOVEMBER 20, 2019, 9:45 A.M.

    (Call to Order of the Court.)

        THE COURT:  Good morning, everybody.

        MS. COLLINS:  Good morning, Your Honor.

        THE CLERK:  CV 18-857-MRW, *Donna Walker v. City of Los Angeles.*

        Counsel, please state your appearances.

        YANA G. HENRIKS:  Yana Henriks for plaintiffs, Your Honor, and my apologies.

        THE COURT:  You're fine.

        MS. HENRIKS:  The street was flooded.

        THE COURT:  It's a rainy day, Ms. Henriks.  I'm glad you're here.

        HASMIK J. BADALIAN COLLINS:  Good morning, Your Honor.  Hasmik Badalian Collins on behalf of the City defendants.

        THE COURT:  Ms. Collins.

        ALEX W. CRAIGIE:  Good morning.  Alex Craigie on behalf of Defendants AutoZone and Carlos Moran.

        THE COURT:  Okay.  Good morning to you, Mr. Craigie.  Have a -- Mr. Craigie's going to go to the lectern first because we're going to chat about a few things.

        By the way, Ms. Collins, who do you have in the back?  I think I see your investigating detective.

        MS. COLLINS:  Yes, Your Honor.  So this is

1    Detective Theresa Velez (phonetic) from the Los Angeles

2    Police Department, and seated to her right is

3    Ms. Rebecca Young, a deputy city attorney from the

4    Police Litigation Unit.

5              THE COURT:  Welcome.  Thank you.

6              All right.  Just like to know who's here, but it's

7    a public court.  Everybody is welcome.

8              All right.  So we're on today for a bunch of stuff.

9    There has been a request to amend the Complaint, there has

10   been a motion for discovery, and then there are some

11   scheduling issues that we need to take up, and I want --

12   well, we'll get to them, and we have time to get through it

13   in an orderly way, but as the paper was coming in and as I

14   was learning additional information about this case -- I'm

15   not a litigant.  I haven't seen it all in real time, although

16   my involvement with the depositions over the summer was

17   helpful -- it became apparent to me that there have been some

18   evidentiary developments that are of importance.

19             And what I viewed in the course of all this was I

20   received additional materials from the parties, and I'm aware

21   of the -- we'll call it a "trial video" that plaintiffs have

22   prepared which interloops Mr. Moran's 9-1-1 call,

23   surveillance video from the AutoZone store in Reseda, and the

24   report of interview or the -- I don't know what the LAPD

25   calls it -- report of interview from the investigating

1   officers from their discussions with Mr. Moran on the night

2   of the incident in 2016.

3          You've seen it, right, Mr. Craigie?

4          MR. CRAIGIE:  Oh, yes, Your Honor.  Thank you.

5          THE COURT:  "Oh, yes," he says.

6          And so I took a look at that.  I also looked at --

7   but not in detail, but I sampled the video interviews that

8   Detective Riemen conducted of Mr. Cardenas and Mr. Moran.  I

9   didn't study those in great detail, but it looks like she

10  questioned them.  Cardenas was in custody, Mr. Moran

11  obviously was not is my recollection.

12         And I guess before we get into other issues, I

13  would just like to know a little bit more about how some of

14  these materials were assembled, produced.  I had some other

15  questions for the AutoZone folks, but it's been my

16  understanding -- and you folks can educate me on this -- that

17  on the day of the incident, 2016, Mr. Moran was aware that

18  there was video surveillance in the AutoZone store,

19  obviously, but he was not himself personally able to access

20  that video to give to the police.

21         MR. CRAIGIE:  Correct.

22         THE COURT:  Okay.  And so the police did whatever

23  they did, they made the arrests, I think, that day -- that's

24  the subject of the case -- and then at some point, am I

25  correct that there was a request from LAPD to AutoZone for

1   the surveillance video?

2          MR. CRAIGIE:  My understanding, based on the

3   testimony that's come in from numerous witnesses, including

4   Mr. Moran, was that at the conclusion or thereabouts of their

5   interview with him on the day of the incident, they requested

6   that he -- they first asked him, "Can you access the video?"

7          THE COURT:  Right.

8          MR. CRAIGIE:  He said, "No, I can't.  That has to

9   come from corporate."

10          He then asked -- they then -- I wouldn't call it a

11   request.  They said, "Get us that video."

12          THE COURT:  Right.

13          MR. CRAIGIE:  And he said, "I will," and did

14   request it.

15          THE COURT:  Okay.  So the investigating officers on

16   the day in question asked Mr. Moran to contact AutoZone

17   corporate or AutoZone security for that information?

18          MR. CRAIGIE:  From my having been in all of the

19   depositions, that is what I understand the case to be.

20          THE COURT:  Okay.

21          And, Ms. Collins, I don't mean to go back and

22   forth, but you're all really familiar with this record.  The

23   robbery or the alleged robbery and the phone call to 9-1-1

24   was sort of in the late afternoon of that day; correct?

25          MS. COLLINS:  Yes, Your Honor.

```
 1              THE COURT:  And the time of the report that the

 2   lead officer prepared reads something like 8:00 at night?

 3   2000 hours?

 4              MS. COLLINS:  I believe it was in the early evening

 5   hours.  Yes, Your Honor.

 6              THE COURT:  Okay.  But it's all the same incident;

 7   correct?

 8              MS. COLLINS:  Yes.

 9              THE COURT:  Okay.  Okay.  Got it.

10              All right.  So how long did it take the AutoZone

11   staff to get the video to LAPD?  And I'll take your best

12   estimate ballpark.

13              MR. CRAIGIE:  I don't know.

14              THE COURT:  Okay.

15              MR. CRAIGIE:  I can't even provide an estimate.

16              THE COURT:  Okay.  Ms. Collins can.

17              MS. COLLINS:  Yes, Your Honor, and I'm going to

18   refer to the police reports, which have been Bates numbered

19   COLA 0003, which comports with the deposition testimonies

20   thus far, is that Detective Riemen stated that on August 10th

21   (reading) after repeatedly requesting the store surveillance

22   video for the above crime, I received a phone call that the

23   above video and another video on a separate incident was

24   ready to be picked up at the store.

25              So on that same date, she states that she picked up
```

1   an envelope which contained two unmarked CDs.

2           THE COURT:  Okay.  So that's August, and the

3   incident itself was late July?

4           MS. COLLINS:  July 21st, Your Honor.

5           THE COURT:  Okay.  So -- one, two -- almost three

6   weeks for a video to be put in hands of LAPD?

7           MS. COLLINS:  That's correct.  For the first time,

8   Your Honor.

9           THE COURT:  And that's not the investigating

10  officers?  That's the detective?

11          MS. COLLINS:  That's the detective.

12          THE COURT:  Okay.  Is that the video that she

13  contends she was not able to view?

14          MS. COLLINS:  She contends she was not able to view

15  various versions of that video, Your Honor.  She was not able

16  to view that one.  She then contacted corporate again, and

17  they said that the AutoZone -- auto run feature had been

18  included on the CD.  So she was unable to view it.  She then

19  got another copy on August 17.  She was able to pick that up,

20  and that was also -- she says (reading) unable to

21  successfully view that copy as well.

22          THE COURT:  Did I see some notes in a file or some

23  of the materials that she actually brought in, like, the IT

24  folks at LAPD?

25          MS. COLLINS:  Yes, Your Honor.  She actually went

1    to the Scientific Investigation Division and had them try to

2    do it.

3              THE COURT:  Scientific Investigation.  All right.

4              Okay.  So from AutoZone's perspective, you turn

5    over a copy, you turn over another copy -- okay.

6              Let's move forward to the litigation.  From

7    AutoZone's perspective, you were aware that Mr. Moran was

8    alleging four people came in, four people robbed the store,

9    four people did it; correct?

10             MR. CRAIGIE:  Correct, Your Honor.  I was -- that

11   was the declaration that we submitted in support of our

12   motion to be relieved from the default --

13             THE COURT:  Got it.

14             MR. CRAIGIE:  I interviewed him, we lashed together

15   a declaration, and I will concede right here, and this may be

16   where you're going, that his recollection was not consistent

17   with what the video shows.

18             THE COURT:  Or his call to 9-1-1?

19             MR. CRAIGIE:  Well, I don't know that I want to

20   engage in a debate with you about whether there was more than

21   one call to 9-1-1.  My information --

22             THE COURT:  No, no.  Tell me factually.  What do

23   you know?

24             MR. CRAIGIE:  He believes -- Mr. Moran is a less-

25   than-stellar witness.  I have asked him and received

1  different answers on the question of "How many times did you

2  call 9-1-1?"

3        THE COURT:  Well, give me the range of answers you

4  got from him.

5        MR. CRAIGIE:  One or two.  Now, I will say that the

6  video appears to show him on the phone both following

7  Mr. Cardenas and his -- the female that was accompanying him

8  -- their visit, and then I believe the video also shows him,

9  at least, holding his phone, potentially dialing it,

10  following the visit by the Walker plaintiffs.

11        THE COURT:  Okay.

12        MR. CRAIGIE:  So, again, I recognize that Mr. Moran

13  is a less-than-perfect witness.  He -- if you -- I recognize

14  that this case has been -- what happened, if it indeed

15  wrongfully happened, was devastating to the plaintiffs to be

16  locked up in jail.  On the other hand, from Mr. Moran's

17  perspective, he is trying to run a business where there is a

18  lot of customers, and he has no idea that this is going to

19  bloom into something beyond a simple shoplifting.  That was

20  all he reported to the LAPD.  So his locking in of details

21  regarding how many people came in and when they came in may

22  be less than stellar, and I'll acknowledge that.

23        THE COURT:  Okay.

24        Ms. Collins, how many 9-1-1 calls is the City aware

25  of?

1          MS. COLLINS:  Your Honor, the City is aware of one

2    9-1-1 call.  I have requested any and all 9-1-1 calls from

3    that time period, understanding that this might be an issue,

4    and I've been told that there is only one 9-1-1 call from

5    that location, incident involving those set of facts, and so

6    we have proceeded with the understanding that there is only

7    one 9-1-1 call.

8          Before we move on, Your Honor, I would just state

9    one thing, as I obviously do not agree that that was --

10   shoplifting was all that he reported to LAPD, having listened

11   to the 9-1-1 call, but that's neither here nor there.

12         THE COURT:  Well, I mean, he says that "The guy

13   pushed me."  So you're -- you know, you're in the world of

14   assault, perhaps, or robbery?

15         MS. COLLINS:  Yes, Your Honor.  And so, when you've

16   got a theft with an assault, that would be a robbery.

17         THE COURT:  Okay.  Back to crim law.  Okay.  Okay.

18         MR. CRAIGIE:  What I will say regarding what

19   Mr. Moran has testified to, regardless whether his version of

20   the events where they all file in together and leave

21   together, in his mind -- and this is borne out by the fact

22   that he took photographs at the same time of both the Walker

23   plaintiffs and Mr. Cardenas in his vehicle --

24         THE COURT:  Well, clearly, because he reported --

25   he reported them and gave license plates to the police;

1    right?

2              MR. CRAIGIE:  Of both.

3              THE COURT:  Right.

4              MR. CRAIGIE:  And in his mind and in his testimony,

5    this was one event and so --

6              THE COURT:  Okay.  So I have not seen the raw

7    surveillance video.  What I saw was the package that the

8    Walker parties -- plaintiff gets really confusing because

9    they were, obviously, charged criminal defendants, and so I'm

10   trying to make sure I understand the terms because I don't

11   want to get turned around.  The Walker parties submitted the

12   sort of trial-ready version of who showed up when, which, you

13   know, you have very gracefully acknowledged may not comport

14   exactly with the AutoZone employee's statements, but is there

15   more to this video evidence -- recognizing Mr. Moran may not

16   be the most reliable of witnesses, is there anything else on

17   the videos that you have that I should know about at this

18   stage?

19             MR. CRAIGIE:  Well, I think the video does show

20   that, as the Walker plaintiffs are exiting the store, the

21   alarm does trigger.

22             THE COURT:  Okay.

23             MR. CRAIGIE:  And the light goes off, and that was

24   the representation I made to Your Honor way back at the -- at

25   an early scheduling conference.

1          THE COURT:  Okay.

2          MR. CRAIGIE:  And it was following that that I

3   provided a version that was immediately viewable to

4   Ms. Hendriks and her firm.  So -- and bearing in mind also

5   that this course of events took place in --

6          THE COURT:  Hang on one sec.

7          MR. CRAIGIE:  Okay.

8          THE COURT:  So the video that the Walker parties

9   have and that they cut into the version that I reviewed --

10  and I can obviously ask Ms. Hendriks this, but do you think

11  that came from the video that AutoZone provided or that the

12  City provided?

13          Well, Ms. Collins --

14          MR. CRAIGIE:  You'll have to ask that from

15  Mrs. Hendriks.

16          THE COURT:  Fair enough.

17          MR. CRAIGIE:  I believe her declaration -- and

18  she'll have to clarify, but I believe from her declaration

19  that that was one that we produced --

20          THE COURT:  Okay.

21          MR. CRAIGIE:  -- in discovery, but I could be

22  wrong.

23          MS. COLLINS:  Your Honor, I can 100 percent state

24  that it was the video provided from AutoZone to plaintiffs

25  because City has never provided a copy of the surveillance

1   video --

2           THE COURT:  Why not?

3           MS. COLLINS:  -- to plaintiffs, because the first

4   time we received a viewable copy was when Mr. Craigie also

5   provided it to us in civil litigation.

6           THE COURT:  So -- okay.  Got it.

7           So the criminal case resolves.  The City Attorney

8   dismisses.  The police department retained a copy of whatever

9   it received from AutoZone in the course of the investigation;

10  correct?

11          MS. COLLINS:  Yes, Your Honor.

12          THE COURT:  Did you view or attempt to view that

13  copy of the video?

14          MS. COLLINS:  Yes, Your Honor.  We have attempted

15  to review multiple copies since multiple copies were provided

16  from AutoZone --

17          THE COURT:  Got it.

18          MS. COLLINS:  -- to the City, and none of those

19  copies were able to be viewed in either -- at my desk, at my

20  investigator's desk.  We brought in the Scientific

21  Investigation Division again --

22          THE COURT:  Okay.

23          MS. COLLINS:  -- and they tried to review it again,

24  and they still could not.  So the first viewable copy that

25  the City has seen of this incident was the copy provided by

1  Mr. Craigie.  I want to say it was December of 2018; so about

2  a year ago.

3          MR. CRAIGIE:  In connection with our initial

4  disclosures, Your Honor.

5          And if I may state this about the video is even if

6  the video had been provided the next day -- let's say it had

7  -- somehow AutoZone had done what I don't believe any

8  retailer in the United States could do, but that's

9  speculation, and immediately provided the police department

10  with that video footage, I --

11          THE COURT:  Why would not -- why would no retailer

12  in America be able to do that?

13          MR. CRAIGIE:  Well, from my understanding, just,

14  again, based on my communications with the loss-prevention

15  people at AutoZone, it is unusual for them to make it

16  available for employees within a store to access it because

17  of risks of contamination and so forth.  So let's set aside

18  my comment.

19          THE COURT:  Okay.

20          MR. CRAIGIE:  Okay.  Bracket that aside.

21          THE COURT:  I --

22          MR. CRAIGIE:  The -- even if they had received --

23  immediately received that video, I'm not sure that there's a

24  -- that it would have caused or been a substantial factor in

25  bringing about any different result than the Walkers being in

1    jail over the weekend, which is their damages.

2            THE COURT:  Well, I don't know that you're going to

3    speak for LAPD here.  Okay.

4            MR. CRAIGIE:  Okay.  Well, I think that came out

5    during discovery, but that's fine, Your Honor.

6            THE COURT:  Well, I mean --

7            MR. CRAIGIE:  I mean, I --

8            THE COURT:  -- do you really want to tell me what

9    the investigating officers or the detectives would have done

10   having seen that video?  I can't imagine how an auto parts

11   store wants to do that.

12           MR. CRAIGIE:   I guess I'm not sure that that video

13   exonerates these folks so --

14           THE COURT:  Well --

15           MR. CRAIGIE:  I mean, it was -- it's only been

16   after --

17           THE COURT:  Well, if you're not really sure, then

18   that's a different issue.

19           MR. CRAIGIE:  Okay, Your Honor.

20           THE COURT:  Okay.  So -- got it.

21           So let's move on.  Cardenas and Moran have the

22   video-recorded interviews.  That's going to be sometime in

23   July or August of 2016; correct?

24           MS. COLLINS:  Yes, Your Honor.  I believe the date

25   was July 28th of 2016.

```
 1              THE COURT:  Okay.  Thank you for being prepared.

 2              All right.  And those were produced in this

 3   litigation in February of 2019?

 4              MS. COLLINS:  Yes, Your Honor.  The police report

 5   that summarized that was produced in January.  The recordings

 6   themselves were produced in February after plaintiffs paid

 7   the fees for the CDs.

 8              THE COURT:  Got it.  Okay.  All right.

 9              So -- and when did the 9-1-1 call get produced,

10   roughly?

11              MS. COLLINS:  I'd have to look at my notes,

12   Your Honor, but it was sometime in January of 2019.

13              THE COURT:  Why was that earlier?  Do you know?

14              MS. COLLINS:  I'm sorry?

15              THE COURT:  Why was that earlier?

16              MS. COLLINS:  Because, Your Honor, when we pull the

17   records of each of these cases, the recordings were

18   associated with the Cardenas file, not with the Walker files.

19   The 9-1-1 call was associated with Walker.  So, when we

20   pulled that, that's what we produced.

21              THE COURT:  And I'm aware that the Walker parties

22   have a contention that, although it was sort of two

23   investigations, there may have been a single case number or

24   some sort of linking number.  I'm not sure I need to go too

25   far on that, but I understand your point.  Okay.
```

1              All right.  So AutoZone's contention is that

2    Mr. Moran, whether he accurately reported all of the events

3    -- sorry.  Let me back this up.

4              Am I -- is my viewing of the video correct,

5    Mr. Craigie, that Cardenas and his accomplice come into the

6    store, leave the store, Moran believes that they shoplifted,

7    Moran calls 9-1-1 before the Walker parties enter and may

8    actually be on the phone with 9-1-1 as the Walkers -- or

9    Walker and Tresvant are in the store, and that, after that

10   9-1-1 call is concluded, he then suspects the Walker parties

11   of shoplifting because of a later alarm that goes off?

12             MR. CRAIGIE:  Okay.  So the -- what Mr. --

13             THE COURT:  Do you want to unpack that one?

14             MR. CRAIGIE:  What Mr. Moran's testimony, excluding

15   this notion that they came together and left together --

16   Mr. Cardenas comes in with his companion --

17             THE COURT:  You can say "accomplice."  We can talk

18   cop talk.

19             MR. CRAIGIE:  Okay.  They leave the store without

20   making a purchase.  They trigger the alarm.  Our loss-

21   prevention expert will testify that the alarm was triggered

22   as they left --

23             THE COURT:  By the way, is that based on the video,

24   or is there, like, some other technological --

25             MR. CRAIGIE:  Video.  Yeah, video.

```
 1              THE COURT:  Okay.  So that's viewable in the video?
 2  I --
 3              MR. CRAIGIE:  Yes.  You can see the light.
 4              THE COURT:  Okay.
 5              MR. CRAIGIE:  Okay?
 6              THE COURT:  I wasn't looking for it.
 7              MR. CRAIGIE:  I'm less familiar with that as I am
 8  with the Walkers, but he's confident that they made a theft.
 9  Okay.
10              THE COURT:  Oh, and stuff was recovered later from
11  --
12              MR. CRAIGIE:  Yeah.
13              THE COURT:  -- from the car, which was consistent
14  with inventory at the story?
15              MR. CRAIGIE:  Yeah.  I mean -- okay.
16              And then -- so very quickly after they left, within
17  the span of five minutes or less, the Walkers enter.
18              THE COURT:  Yeah.
19              MR. CRAIGIE:  He witnesses Chandra -- Plaintiff
20  Chandra Tresvant place -- take an item and put it in her bag.
21  She comes in with a big bag -- put something in her bag.
22              THE COURT:  Oh, no.  He eventually reports that to
23  the police.
24              MR. CRAIGIE:  I understand that, but I'm just
25  telling you --
```

1            THE COURT:  Yeah.

2            MR. CRAIGIE:  -- there's more than just the alarm.

3            THE COURT:  Oh, it's not just the light.

4            MR. CRAIGIE:  Right.

5            THE COURT:  Yeah.  Okay.  Got it.

6            MR. CRAIGIE:  He sees that.  He then goes about his

7   business.  They walk out.  He chases her out, takes pictures

8   -- takes pictures of the -- Mr. Cardenas, and at some point

9   during this exchange is when Mr. Cardenas says, "You let them

10  go," and just -- he doesn't shove him, but he restrains him

11  or puts his arm --

12           THE COURT:  I'm sorry.  That -- you've lost me.

13  Are you telling me that the Walker parties and Cardenas were

14  present in the AutoZone at the same time?

15           MR. CRAIGIE:  No.  They were -- as far as Mr. Moran

16  has testified, they were out in the parking lot.  They were

17  all making fun of him because he was trying to enforce the

18  rules, I guess, as you might say.  He was trying to get the

19  Walkers to come back in and show what was in their bag

20  because the alarm had been triggered.

21           THE COURT:  Okay.  So -- and I understand you're

22  here with information from a guy, and I'm well able to

23  distinguish lawyer from client.

24           MR. CRAIGIE:  Right.

25           THE COURT:  So my understanding of the video

1  evidence that's been presented to me is that Cardenas and

2  accomplice walk in, do whatever they do, Moran suspects

3  shoplifting, confronts Cardenas by the front door, gets the

4  shove, Cardenas and accomplice leave, Moran goes outside,

5  takes a photograph, comes back into the store, and calls

6  9-1-1.  Am I recalling this correctly?

7          MR. CRAIGIE:  My understanding from Mr. Moran --

8  and, again, lawyer-witness -- is that he took the photographs

9  at the same time.  He took the plaintiffs, and he took --

10          THE COURT:  Okay.

11          MR. CRAIGIE:  -- Mr. Cardenas.

12          THE COURT:  Now we're going to distinguish lawyer

13  and client.  Based on your viewing of the video, is my

14  recitation of the events correct?

15          MR. CRAIGIE:  I believe that -- I mean, I've been

16  laboring under this impression that this exchange -- because

17  I don't understand why Mr. Cardenas would put his hand on

18  Mr. Moran and say clearly "let them go," unless he was

19  referring to the Walkers.  So that's why I believe that

20  exchange occurred with the Walkers present and Mr. Cardenas

21  present in the parking lot, not in the AutoZone.

22          THE COURT:  Okay.  Let's go back to my question.

23          MR. CRAIGIE:  Okay.

24          THE COURT:  Is my viewing of the video consistent

25  with your understanding that Cardenas and accomplice enter,

1    Moran suspects shoplifting, Moran is viewed confronting

2    Cardenas, Cardenas puts hand on him, Cardenas leaves, Moran

3    goes outside, takes a picture, comes back in, and calls

4    9-1-1?

5              I see you got your eyes closed, and you're thinking

6    carefully.  I'm very grateful for this.

7              MR. CRAIGIE:  Well, I'm trying to listen so that I

8    answer --

9              THE COURT:  It's okay.  It's okay.

10             MR. CRAIGIE:  -- your question because you made it

11   clear that I didn't before.

12             Everything I believe you've -- that you're -- you

13   and I are on the same page with the exception of when the

14   altercation with Mr. Cardenas occurred in which there was a

15   hand placed on --

16             THE COURT:  Was that outside the store and not

17   inside?

18             MR. CRAIGIE:  Outside the store --

19             THE COURT:  That's fine.

20             MR. CRAIGIE:  -- and with the Walkers present.

21             THE COURT:  Is that on the video?

22             MR. CRAIGIE:  No.  There's no video of the outside

23   --

24             THE COURT:  Okay.

25             MR. CRAIGIE:  -- of that part of the outside.

1    THE COURT:  That's -- got it.  And I take that as a

2  given.

3    Ms. Collins, you bopped up and you sat back down?

4    MS. COLLINS:  Yes, Your Honor.  I just wanted to

5  state my memory of what you see in the video, which is that

6  the Cardenas group walks in, walks out; Moran follows

7  outside; you then don't see anything outside --

8    THE COURT:  Fair enough.

9    MS. COLLINS:  -- then Moran walks back in.

10    THE COURT:  Okay.  And -- okay.  And, I mean, my

11  intuition was that that's when he took the photo?

12    MR. CRAIGIE:  But --

13    MS. COLLINS:  Your Honor, either the photo gets

14  taken at that time, or it gets taken at a later time when he,

15  again, follows the Walkers outside.  I think there's two

16  possibilities.  I'm not sure what happens, but from what we

17  can tell in the video, Cardenas walks in; Cardenas walks out;

18  Moran follows; Moran comes back in; Walker comes in; Walker

19  walks out; Moran follows; Moran walks back in.

20    THE COURT:  So that would -- I'm with you.  I got

21  it.  And so that would mean that Mr. Cardenas and his

22  accomplice walked into the AutoZone, boosted some stuff, got

23  confronted by a manager, went out into the parking lot, and

24  hung out even if, as one would suspect, the store manager

25  went back in and called the cops?

1          MS. COLLINS:  That's correct, Your Honor.

2          THE COURT:  Why are you grinning at me?  What's

3    funny about that?

4          MS. COLLINS:  Because --

5          THE COURT:  I understand why Ms. Hendriks is

6    grinning.  She's enjoying the fact that I'm reading

7    everything.

8          MS. COLLINS:  Well, because --

9          THE COURT:  I suspect.  I don't want to put words

10   in your mouth, Ms. Hendriks.

11         MS. COLLINS:  I would just state, from a former

12   prosecutor's perspective, that's probably unlikely but --

13         THE COURT:  Okay.  Well, unlikely is important.

14         MS. COLLINS:  Yes.

15         THE COURT:  Okay.  Okay.  But Mr. Moran -- former

16   employee?

17         MR. CRAIGIE:  Still employed.

18         THE COURT:  Still employed.

19         MR. CRAIGIE:  Still the store manager.

20         THE COURT:  Got it -- says, essentially, that

21   Cardenas hung around in the store parking lot -- unless he

22   left and came back -- because Moran's testimony is going to

23   be along the lines of "and then the shoplifting of the

24   Walkers went down, and when the Walkers left, there was

25   Cardenas" -- maybe the gang leader, maybe the organizer --

 1    "still in the parking lot."  Is that what he's going to say?

 2            MR. CRAIGIE:  That's what he's told me.  And it's

 3    not --

 4            THE COURT:  Okay.  Well --

 5            MR. CRAIGIE:  -- quite the way you've broken it

 6    down, but I appreciate your step-by-step analysis.  I've been

 7    operating under the assumption that his statement, quote,

 8    "let them go," coupled with the contact was in connection

 9    with the Walkers.

10            THE COURT:  Okay.  But -- I got that but I just --

11    and I don't want to belabor it, but I just want to make sure

12    I've got it.

13            Ms. Collins?

14            MS. COLLINS:  I don't think that that's actually

15    what Mr. Moran has testified.  I think Mr. Moran still

16    testified at his deposition that they all four walked in,

17    they all four walked out, and then that's when it occurred --

18    the shoving or the holding back occurred, not that

19    Mr. Cardenas was still hanging out in the parking lot when it

20    happened.  So that's just the one clarification I would

21    state.

22            THE COURT:  Okay.  Well, I mean, I'm not here to

23    opine on truthfulness or what happened but --

24            MR. CRAIGIE:  No, and she's correct.  She's

25    correct.  You've got me now thinking along your --

```
 1                THE COURT:  Okay.

 2                MR. CRAIGIE:  -- but the truth is that has been

 3    Mr. Moran's testimony all along.  The only thing he's wavered

 4    on is whether he made one or more 9-1-1 calls, and we have to

 5    live with that, and I'm -- and I understand that.

 6                THE COURT:  Okay.

 7                MR. CRAIGIE:  He has been unwavering about two

 8    facts, which is that he did witness Ms. Tresvant put

 9    something in her purse and that the alarm went off as she

10    went out.  You can see people looking at it and looking at

11    them -- him going out after her so --

12                THE COURT:  And although he did not mention them on

13    the 9-1-1 call, because he couldn't have mentioned them on

14    the 9-1-1 call because according to the video they hadn't

15    shown up at the store, he did tell your -- the LAPD

16    investigating officer about all four of them and was able to

17    provide a photograph of their license plate; correct?  Excuse

18    me.

19                MR. CRAIGIE:  Yes.

20                THE COURT:  Of both the Walker parties as well as

21    Cardenas?

22                MR. CRAIGIE:  Based on what's in the reports and

23    what's -- the interviews that you've seen.

24                THE COURT:  Okay.

25                Did I get that right, Ms. Collins?
```

1          MS. COLLINS:  Yes, Your Honor.  I think it's

2    unclear when these pictures were taken in relation to each

3    other --

4          THE COURT:  Clearly.

5          MS. COLLINS:  -- but two pictures were taken.

6          THE COURT:  Got it.  Well -- okay.

7          Okay.  Why don't we pause, Mr. Craigie, because I

8    think you can sit down now.

9          MR. CRAIGIE:  Thank you.

10          THE COURT:  Ms. Hendriks, I know you got a lot to

11    tell me today.  We'll get to that, but can we -- no, no, no.

12    But I would like to hear from you because -- let's just talk

13    about the issues of video, 9-1-1 call, my discussion with

14    Mr. Craigie and Ms. Collins just now.  Do -- are we on the

15    same page?

16          MS. HENRIKS:  Sure.  Yes.

17          THE COURT:  Okay.

18          MS. HENRIKS:  Your Honor, I just wanted to point to

19    two things that I believe the Court was incorrect about.

20          THE COURT:  Good.  Do it.

21          MS. HENRIKS:  They have never recovered stolen

22    items from Mr. Cardenas's car.  It's -- it was not.  The

23    important fact is that Mr. Cardenas, during the interview

24    with Detective Riemen, actually placed a call to white female

25    Jennifer and --

1          THE COURT:  Oh, he very much wanted to talk to her.

2  Yeah.

3          MS. HENRIKS:  -- and said that "Listen.  I'm going

4  to take a hit for you.  Please bring back and come and

5  confess that you shoplifted because they're accusing me," and

6  you know, "Here's detective's phone number," and all this.

7  Detective Riemen at that point basically shows this lack of

8  interest.  She even had his phone.  She could have certainly

9  --

10          THE COURT:  All right.  No, no, no, no.  You're

11  getting away from it.  Yeah.

12          MS. HENRIKS:  So he -- the -- Mr. Cardenas had

13  denied ever knowing any African-American females --

14          THE COURT:  Yeah.  I got -- I know that.  I know

15  that.

16          MS. HENRIKS:  He even made -- used a statement that

17  he doesn't hang out with blacks.

18          THE COURT:  I've heard it.  I read it.  I saw it.

19          MS. HENRIKS:  Yes.  So the point is --

20          THE COURT:  All right.  So there were not, like, a

21  pair of, like, auto-repair gloves recovered from the car?

22          MS. HENRIKS:  No.  That's something they -- but

23  that's not what was missing.  It was allegedly missing some

24  battery something that was missing, but there was -- I don't

25  think there were any links with these gloves that are found

1    in his store with something that was missing at AutoZone.

2              THE COURT:  All right.  Let me hear from

3    Ms. Collins --

4              MS. HENRIKS:  Yes.

5              THE COURT:  -- because she bounced up.

6              MS. COLLINS:  That is an incorrect statement,

7    Your Honor, as can be found in a document that was produced

8    to all parties, which is Walker-City 186.  Officer Horn

9    conducted a compliance check on Defendant Cardenas's silver

10   Jaguar and recovered a brand new pair of black mechanic's

11   gloves.

12             THE COURT:  Was that the time of his arrest or --

13             MS. COLLINS:  Yes, Your Honor.

14             THE COURT:  Okay.  Now, new gloves with packaging?

15   New gloves that --

16             MS. COLLINS:  That's correct, Your Honor.  In fact,

17   the next paragraph reads (reading) I then -- at approximately

18   1615 hours, I called Witness Roman and asked if her -- well,

19   actually -- I'm sorry.

20             The sentence before it was (reading) black

21   mechanic's gloves with the security sensor still on them.  On

22   July 28, 2016, at approximately 1615 hours, I called

23   Witness Roman and asked her if her store sold the above

24   gloves, and she stated that they did, along with other auto

25   stores.  Witness Roman stated that both she and Moran were

1  unsure as to exactly what merchandise was taken by

2  Suspect No. 2 -- which was Cardenas.  (Reading) Witness Roman

3  did state that, depending on the style of gloves, the price

4  ranges from approximately $20-30.

5          THE COURT:  Yeah.  I read that.  Yeah.

6          MS. HENRIKS:  They're able to do the stock check,

7  which is they did, and they claim there was battery accessory

8  missing in my clients' case.  There was no reporting gloves

9  missing nor anybody did a stock check to report gloves

10  missing.  The point is --

11          THE COURT:  I know.  What I said was that they

12  found materials in his car that were --

13          MS. HENRIKS:  They thought --

14          THE COURT:  -- a, obviously stolen because it's

15  still got the store security tag on it --

16          MS. HENRIKS:  I --

17          THE COURT:  -- and, b, consistent with their

18  inventory.

19          MS. HENRIKS:  Oh, it's not -- well, there is no

20  proof that it was consistent because they have a way of

21  identifying that it's missing.  And they didn't, which is in

22  my clients' case, they said something like this was missing.

23          But that's not even -- the point is the -- there is

24  other evidence to point that they were never in the same

25  parking lot at the same time -- Cardenas and my clients.

1          THE COURT:  What's that other evidence besides him

2    saying he doesn't hang out with black people?

3          MS. HENRIKS:  Well, I can't if I'm going to try the

4    case, Your Honor.  I mean, it's clear from a location and

5    pictures they weren't -- I mean, there are other forensic

6    evidence to show that they weren't -- they were gone, and

7    it's --

8          THE COURT:  I'm sorry.  You have other evidence

9    you're going to be using at trial?

10          MS. HENRIKS:  No.  I mean, it's just analysis of

11   evidence based on -- I mean, I can point out to evidence why

12   it's impossible, but it's the same evidence.  There's other

13   evidence, meaning that I can point to the evidence existing

14   that -- why it was impossible, but I can't discover it now.

15   If Mr. Moran is going to testify that that happened, I want

16   to be able to impeach him.  I'm talking about existing

17   evidence when I say there is in evidence that it's -- didn't

18   happen -- existing evidence that -- in photos it will show

19   that it would not be possible.

20          THE COURT:  All right.  So you've got some argument

21   based on information that's --

22          MS. HENRIKS:  Based on photographs.  Correct.

23          THE COURT:  Oh, okay.  So -- okay.

24          MS. HENRIKS:  Based on photographs that it's --

25          THE COURT:  All right.

1    MS. HENRIKS:  -- it wasn't.  And most importantly,

2 the version presented by Mr. Moran that it was this elaborate

3 scheme -- they came in, they had bags, they spread out, they

4 talked and --

5    THE COURT:  Yeah.  No, it can't be.  It can't be.

6    MS. HENRIKS:  It can't be.  No.  And the point is I

7 highly doubt he was confused.  I -- because certain --

8    THE COURT:  So let me -- I mean, you're not here to

9 argue the case.  I mean, that's going to come down the road

10 later.  Your request to modify -- to amend the Complaint and

11 add Detective Riemen is premised on your contention that she

12 possessed and withheld material exculpatory evidence.

13    MS. HENRIKS:  Yes.

14    THE COURT:  Right?

15    MS. HENRIKS:  Yes.

16    THE COURT:  Okay.  And as best I could tell, your

17 contention is that she possessed but failed to produce -- to

18 the City Attorney, right, who charged the case, or --

19    MS. HENRIKS:  Yes.

20    THE COURT:  Okay -- was Cardenas's statement that

21 he doesn't hang out with black people and doesn't know these

22 women; right?

23    MS. HENRIKS:  Correct.  That's --

24    THE COURT:  Okay.  And that she possessed but

25 didn't turn over or log into evidence the video; correct?

1          MS. HENRIKS:  Your Honor, she's seen the video.

2    She's seen the video.  Video is playable.  It's so easy --

3          THE COURT:  She has seen the video?

4          MS. HENRIKS:  She has seen the video, and I will be

5    able to prove it at trial because -- the most credible

6    witness out of all of them that I've encountered in this

7    litigation was Gene Bohannon is a PMK and the person in Texas

8    who flew, and according to his testimony --

9          THE COURT:  PMK for AutoZone?

10         MS. HENRIKS:  For AutoZone.  Correct -- there was

11   never a request early to get this.  As soon as he got the

12   request, he sent the surveillance video.  Nobody every called

13   him and asked him for any problems using the video, and he

14   was very credible, and it's going to be a question for a

15   jury.  The way this detective described the video being

16   scribbled, particularly Hackman -- Mr. Hackman --

17   Officer Hackman describing -- clearly, it was false.  That

18   was a false statement in a report because they knew that

19   video was exonerating for the -- my clients, and also, it

20   would be exonerating as to the robbery --

21         THE COURT:  Can we go back to your statement?

22         MS. HENRIKS:  Yes.

23         THE COURT:  You have told me that Detective Riemen

24   has seen the video.

25         MS. HENRIKS:  I believe so, and I'm going to argue

1    that to the jury that she's seen it.

2           THE COURT:  I understand about argue.  And the --

3    does she say that she had seen the video?

4           MS. HENRIKS:  No.  She's denying it.

5           THE COURT:  Okay.

6           MS. HENRIKS:  She said it wasn't viewable.

7           THE COURT:  Okay.  Okay.  And so, when I ask you

8    why do you say that she has seen the video? one is because

9    the PMK from AutoZone says that, basically, "I turned it over

10   in a viewable form and did not get a complaint from LAPD"?

11          MS. HENRIKS:  Nobody ever called for any

12   assistance.  That's number one.  Certain things that she did

13   in her questioning of Mr. Cardenas that tends to believe that

14   she actually seen it.  Certain things that I ask her at the

15   deposition --

16          THE COURT:  Like what?  Like what?  In the

17   questioning of Cardenas --

18          MS. HENRIKS:   Yes.

19          THE COURT:  Okay.

20          MS. HENRIKS:  She said it was a ruse, but it wasn't

21   a ruse.  There's certain statements she made that I doubt

22   that she could make that unless she seen it.

23          THE COURT:  Like what?

24          MS. HENRIKS:  "I saw you up and down in the aisles

25   going," you know, "You're lying" -- blah, blah, blah -- "It

1    happened.  You pushed him.  Just admit you pushed him,"

2    trying to get him on the robbery.  So certain statements she

3    made --

4              THE COURT:  But the push is not on the video.

5              MS. HENRIKS:  Push is not on the video, but she

6    said, "You're going up and down aisles," which is true.  He

7    was going up and down aisles.  In all aisles there is a video

8    of him going up and down.

9              THE COURT:  Sure.

10             MS. HENRIKS:  So she's seen it.  She's seen it.

11   She put him there.  She's seen the video.  That video,

12   Your Honor, it's -- if I played it -- and my ten-year-old

13   daughter is more tech savvy than I am --

14             THE COURT:  Yeah, because she messed with your

15   phone.

16             MS. HENRIKS:  -- then their forensic division -- my

17   vendor played it.  Everybody can play it.  That's absolutely

18   nonsense and the fact --

19             THE COURT:  Well, I understand you doubt her

20   statement that "I didn't see the video"?

21             MS. HENRIKS:  Yes.

22             THE COURT:  Okay.  I got that.

23             MS. HENRIKS:  I think what happened -- it was --

24   and I don't -- I want to be careful with what I think, but at

25   least my theory at trial would be that, because she secured

1    confession from Mr. Cardenas, she didn't want this video to

2    come in because she didn't book it into evidence in

3    Cardenas's criminal file or our -- didn't even make into the

4    evidence room.  Even if the video --

5           THE COURT:  So where was it?

6           MS. HENRIKS:  Because she didn't want that to come

7    in.

8           THE COURT:  No.  Where -- no.  Where was it?

9           MS. HENRIKS:  I don't know.  That's what is -- she

10   never booked it into evidence.

11          THE COURT:  Did you ask her what she did with it?

12          MS. HENRIKS:  I did.  She said she didn't book into

13   evidence.  We -- I got the evidence room log --

14          THE COURT:  That's what she didn't do.  Did you get

15   an answer -- I assume you asked her, "What did you do with

16   it?"

17          MS. HENRIKS:  She is -- she had this statement

18   about her drop-off procedures, that she drops off to the

19   offices of prosecutor and all this, which is -- her testimony

20   was quite conflicting.  I mean, I couldn't get a straight

21   answer about the procedures.  Seems like they do however they

22   want to do business.

23          THE COURT:  Not in general.  What did -- she said

24   -- she told you she couldn't view the video; right?

25          MS. HENRIKS:  Yes.  And that's why she didn't book

1  it into evidence.

2          THE COURT:  Right.  What did she do with it?

3          MS. HENRIKS:  She said she asked the forensic --

4          THE COURT:  Right.

5          MS. HENRIKS:  -- IT guy, who got the job without IT

6  experience, but I don't think -- I don't find him credible,

7  and that's what the trial is going to be --

8          THE COURT:  What did she do with the disc?  Did she

9  put it in a locker?  Did she put it in her drawer?  Did she

10 take it home and shove it under a table?

11         MS. HENRIKS:  She kept it somewhere, she said.

12         THE COURT:  Kept it somewhere.

13         MS. HENRIKS:  She kept it with the file.  Yes.

14         THE COURT:  Okay.

15         MS. HENRIKS:  But that's why it's important I

16 wanted to know whether she booked it, and my understanding,

17 based on the documentation, that she didn't even book it into

18 the Cardenas's evidence file because --

19         THE COURT:  Got it.

20         When did you take the PMK video -- PMK deposition?

21         MS. HENRIKS:  PMK deposition was early on in the

22 case.  Early this year, I believe.  I mean, I -- a few months

23 at least.

24         MS. COLLINS:  It was either March 27th or 28th of

25 2019, Your Honor.

1          THE COURT:  That sound right, Ms. Hendriks?

2          MS. HENRIKS:  Yes.

3          THE COURT:  Okay.

4          MR. CRAIGIE:  It was the 27th, Your Honor.

5          THE COURT:  Got it.  Okay.

6          MR. CRAIGIE:  Or the 28th.

7          THE COURT:  Okay.

8          Ms. Collins, you were up for a minute?

9          MS. COLLINS:  Yes, Your Honor.  What I was going to

10  say is Detective Riemen did testify as to what she did with

11  that video, and that video is where it is today.  She kept it

12  with her arrest package for these people, and it's in the

13  file, and it's still in the file.  And these copies of the

14  videos that are not working have been provided to both

15  plaintiff and Mr. Craigie as well.

16          THE COURT:  Mr. Craigie, what did you do when you

17  got a copy of the video that AutoZone gave to LAPD and then

18  LAPD gave it back to you?

19          MR. CRAIGIE:  Your Honor, I -- to be honest with

20  you, I'm not aware that we received it back.  I'm not

21  suggesting that Ms. Collins is not telling the truth.  I just

22  -- I --

23          THE COURT:  Okay.

24          MR. CRAIGIE:  It may have gone to San Francisco and

25  not made it down to me.

1          THE COURT:  What's in San Francisco?

2          MR. CRAIGIE:  Well, the firm that I'm of counsel

3    with for the purposes of this case is in San Francisco, and

4    all mailings go there.

5          THE COURT:  Okay.

6          Ms. Hendriks, did you get a copy of the video from

7    LAPD?

8          MS. HENRIKS:  That's a blank video, Your Honor.

9    It's empty.  There's nothing on it.  So it's -- that's --

10   that was this whole going back and forth and trying to --

11   there was nothing on it, and it's not the same video at

12   AutoZone, and I choose to believe --

13         THE COURT:  Well, clearly.

14         MS. HENRIKS:  Huh?

15         THE COURT:  It's clearly not what you got from

16   AutoZone.

17         MS. HENRIKS:  No.  No.

18         THE COURT:  Because what you got from AutoZone you

19   were able to view.

20         MS. HENRIKS:  Yes.  And I -- and we asked whether

21   the same thing that Mr. Bohannon produced --

22         THE COURT:  So what was on -- so you received --

23   was it a disc? a memory stick?

24         MS. HENRIKS:  It was a disc.  It just blank and she

25   -- Ms. Badalian Collins says, "It's going to be blank.  You

1   can't view anything."

2           I said, "Okay."  But it's --

3           THE COURT:  Let -- go ahead, Ms. Collins?

4           MS. COLLINS:  Thank you, Your Honor.

5           Five CDs were produced to plaintiffs in February of

6   2019.  One of those CDs was a video recording of Cardenas and

7   Moran.  The other CDs were videos -- copies of the videos

8   that Detective Riemen had in her case package.  One was

9   blank, and that's what was produced to her, which is why she

10  couldn't open it --

11          THE COURT:  Produced to the Walker parties?

12          MS. COLLINS:  That was given to her by AutoZone.

13          THE COURT:  Oh, sorry.  Riemen received -- pronouns

14  don't help me.

15          MS. COLLINS:  Sure.  So --

16          THE COURT:  Riemen received a blank disc from

17  AutoZone?

18          MS. COLLINS:  Riemen has received various copies of

19  the surveillance video, at least two.  Those --

20          THE COURT:  How many?  "Various" doesn't help me.

21          MS. COLLINS:  Our -- from what we can tell, two.

22  The -- one was empty.  Nothing was on it.  The other one has

23  something on it, but it is incapable of being opened.

24          THE COURT:  Okay.  So did you turn over to the

25  Walker parties in this litigation the blank disc and the

1    unviewable disc?

2              MS. COLLINS:  That's correct, Your Honor.  I turned

3    over every piece of evidence.

4              THE COURT:  Okay.

5              Ms. Hendriks, is that what you got?

6              MS. HENRIKS:  Well, I got a blank disc.  Yeah.

7              THE COURT:  Did you get the other one?

8              MS. HENRIKS:  It's -- same blank.  I mean, it's

9    unviewable.  It's --

10             THE COURT:  Well, no -- no.  No.  No.  Those are

11   two different things.  I buy a blank disc from the store,

12   that's blank.  If I put something on that just doesn't

13   function, the disc isn't blank.  It's got corrupted data or

14   bad data or gibberish.

15             MS. HENRIKS:  There was no data.

16             THE COURT:  There was --

17             MS. HENRIKS:  No.  It was -- nothing -- we couldn't

18   even play anything on it.

19             THE COURT:  Right.  Okay.

20             MS. HENRIKS:  Yeah.

21             THE COURT:  Okay.  It's not blank.

22             MS. HENRIKS:  Well, it doesn't even -- it's --

23             THE COURT:  It's --

24             MS. HENRIKS:  So the auto-run feature -- either

25   they can't play because they have to -- you know, it's pretty

1    basic, old-fashioned kind of still -- it's -- it wasn't on

2    it.  It's, like, I could see the -- I could see the -- you

3    know, the -- at least boxes I could have played and not be

4    able to play, but there was nothing on it.  What we got there

5    was nothing on it.

6            THE COURT:  So one of the CDs you received was

7    entirely blank?

8            MS. HENRIKS:  Yes.

9            THE COURT:  Okay.  Did you get a second CD from

10   Ms. Collins?

11           MS. HENRIKS:  I think they were both -- nothing

12   showed.

13           THE COURT:  I --

14           MS. HENRIKS:  Yes, I got two CD's.

15           THE COURT:  Okay.  There's a difference, and I just

16   want to understand this --

17           MS. HENRIKS:  Yes.

18           THE COURT:  -- and you're not -- okay.  One disc

19   totally empty, blank; right?  If I hand you an empty bag, you

20   know it's an empty bag.  Okay.

21           MS. HENRIKS:  Yes.

22           THE COURT:  If I hand you another bag with garbage,

23   you wouldn't say the bag is empty.

24           MS. HENRIKS:  There is no garbage viewed on it.

25   It's -- I can't see even the garbage.  It's -- for me, it's

1   same blank --

2            THE COURT:  Well, do you know that there's garbage

3   on it when you open it up and look on Windows Explorer?

4            MS. HENRIKS:  I couldn't tell.

5            THE COURT:  Okay.

6            MS. HENRIKS:  I couldn't tell.

7            THE COURT:  Okay.  Got it.  All right.

8            MS. COLLINS:  And, Your Honor, just to clarify, it

9   wasn't one CD or two CDs.  It was five CDs.

10            THE COURT:  Well, one of them was the interview of

11   Cardenas?

12            MS. COLLINS:  That's correct, Your Honor.

13            THE COURT:  Was the Moran video the same?

14            MS. COLLINS:  Moran was on the same one as the

15   Cardenas one.

16            THE COURT:  You turned over four -- I mean, do I

17   really have to do it this basically?

18            You turned over four CD-ROMs?

19            MS. COLLINS:  Yes, Your Honor.

20            THE COURT:  One came from AutoZone and -- or was a

21   copy of what came from AutoZone, it was blank, had no data of

22   any sort; correct?

23            MS. COLLINS:  That's correct, Your Honor.

24            THE COURT:  The second one had data on it that came

25   from AutoZone.  The data, though, did not allow viewing?

1          MS. COLLINS:  I think there were two like that,

2    Your Honor, because she made another copy for the

3    Scientific Investigation Division person.

4          THE COURT:  Okay.  So it's a copy of --

5          MS. COLLINS:  Yes.

6          THE COURT:  -- what was received?  Okay.

7          MS. COLLINS:  Yes, Your Honor.

8          THE COURT:  Okay.  Do I -- so it's one disc, two

9    discs, three discs, four discs.  What's the fifth disc?

10          MS. COLLINS:  And one of them was the

11    communications that were on the air of patrol communications.

12          THE COURT:  Oh, okay.  All right.  Okay.

13          So going back to where I was, which was the

14    allegation in the third -- proposed Third Amended Complaint

15    is that Detective Riemen possessed material exculpatory

16    evidence that was not produced to the City Attorney.  One was

17    the substance of Cardenas's statement that he didn't

18    associate with black people and did not know Ms. Tresvant and

19    Ms. Walker.

20          MS. HENRIKS:  Yes.

21          THE COURT:  The second is she possessed the video

22    in some form, and the contention is that -- there's an open

23    issue as to whether it was viewable or not and whether she

24    did view it or not; correct?

25          MS. HENRIKS:  The report stated it was scribbled

1    and, you know, or she made it scribbled somehow.

2            THE COURT:  My question is --

3            MS. HENRIKS:  Yes.

4            THE COURT:  We're going to stay on this because I

5    want to get some answers.

6            You're alleging that she's liable because she

7    possessed material exculpatory evidence that she didn't turn

8    over; correct?

9            MS. HENRIKS:  She didn't turn over to prosecutor or

10   defense.  Correct.

11           THE COURT:  Right.  Okay.  One -- and I'm just

12   trying to get the list.

13           MS. HENRIKS:  Yes.

14           THE COURT:  One is the substance of her interview

15   with Cardenas; correct?

16           MS. HENRIKS:  Correct.

17           THE COURT:  Okay.  The second is the video;

18   correct?

19           MS. HENRIKS:  Correct.

20           THE COURT:  Okay.  Anything else?

21           MS. HENRIKS:  Carlos Moran's interview.  It wasn't

22   turned over as well.

23           THE COURT:  Okay.  How is that exculpatory?

24           MS. HENRIKS:  At the very end it appears to be --

25   it's not clearly that exculpatory, but at the very end it

1    seems like --

2             THE COURT:  Well, if it's not that exculpatory,

3    what --

4             MS. HENRIKS:  Well, it -- she does put words in his

5    mouth, and it would be exculpatory, at least tend to --

6             THE COURT:  What is exculpatory?

7             MS. HENRIKS:  At the very end he -- as he was

8    exiting, he said, "I'm not sure" -- "but I'm not sure."

9             And she said, "No, no, no, no.  You got it.  You

10   got it."

11            Seems like at the very end, Mr. Moran is trying to

12   tell her that he's not sure and --

13            THE COURT:  About what?

14            MS. HENRIKS:  About how the incident happened.

15   Because that seems like last words that I hear, one could

16   reasonably infer that -- defense could argue in a criminal

17   case that, you know, it's being overzealous detective that's

18   putting words in his mouth.  So that's something that also

19   wasn't produced.

20            THE COURT:  Okay.

21            MS. HENRIKS:  The defense in the underlying

22   criminal case was not aware of any prosecution or detention

23   of Mr. Cardenas period because they filed a motion to compel

24   saying "Hey, what happened to the other suspect?" and then

25   it's -- got continued, continued, they couldn't get any

 1  answers, and at some point, when they realized the court is

 2  going to order a motion to compel, they dismissed it.

 3           THE COURT:  Right.  That all went down in 2016.

 4           MS. HENRIKS:  Yeah.

 5           THE COURT:  Okay.

 6           MS. HENRIKS:  Yes.

 7           THE COURT:  And in January of '19, you possessed

 8  the 9-1-1 call?

 9           MS. HENRIKS:  Yes.

10           THE COURT:  Okay.  And you possessed the writeup of

11  Moran's statement to Officer Hackman?

12           MS. HENRIKS:  Yes.

13           THE COURT:  And in February -- excuse me.  And in

14  December of '18, you have the AutoZone video?

15           MS. HENRIKS:  No.  We never got -- well, we got

16  AutoZone video in this litigation.

17           THE COURT:  Yeah, of course.

18           MS. HENRIKS:  Yes.

19           THE COURT:  Yeah.  December of '18.

20           MS. HENRIKS:  Yes.  Yeah.

21           THE COURT:  That's what I said.  Okay.

22           And then by February of '19, you receive the

23  Cardenas interview, the Moran interview, and the reports of

24  investigation in the Cardenas case?

25           MS. HENRIKS:  Correct.

1          THE COURT:  But you have not, of course, spoken to

2    Riemen until whenever she came in here; right?

3          MS. HENRIKS:  No.  And I could not have named her

4    as a defendant just based on my view of her, how she

5    conducted interview, because the question was -- is -- and I

6    was familiar with the system over at LAPD -- the way they

7    work.  It's more like assembly line.  There's one prosecutor

8    does discovery.  One prosecutor goes to court.  I did not

9    know who exactly withheld the evidence, whether it was Riemen

10   or whether it was a prosecutor.  That's why I wanted to get

11   the prosecutor's deposition, but I couldn't until I amend to

12   get the malicious-prosecution claim.

13         THE COURT:  Which of the cops withheld evidence?

14         MS. HENRIKS:  I'm sorry?

15         THE COURT:  Which of the police officers withheld

16   evidence?

17         MS. HENRIKS:  Which of the police officers withheld

18   evidence?  I believe Hackman.

19         THE COURT:  But you sued them all.

20         MS. HENRIKS:  I'm sorry?

21         THE COURT:  You've sued them all.

22         MS. HENRIKS:  I --

23         THE COURT:  You sued Officer Jolicoeur --

24         MS. HENRIKS:  Yes.  That's using the force -- as

25   far as the, you know, arrest and use of force.

1    THE COURT:  No.  I thought he and all the others

2  are in the concealment-of-evidence causes of action?

3    MS. HENRIKS:  I have to double-check.  If his name

4  is there, then it's -- should be by mistake.  I will

5  certainly -- it -- they -- I believe Officer Jolicoeur's

6  involvement is only arresting.

7    MS. COLLINS:  Your Honor, no iteration of the

8  Complaint has ever broken down the cause of action by

9  officer.  All causes of action against the City defendants

10  are against all City defendants.

11    THE COURT:  They're listed as the "all public

12  official defendants"; correct?

13    MS. COLLINS:  That's correct, Your Honor.

14    MS. HENRIKS:  I can't stipulate, then, the officers

15  who conducted arrest only would be cause of action related to

16  the force used during the arrest.

17    THE COURT:  Well, that's where we are now, but why

18  did you sue them in the first place?

19    MS. HENRIKS:  Because there was -- there were three

20  police squads according to the testimony of my clients that I

21  got.  They came in, they pulled them down, they handcuffed

22  them, they, you know, held them outside, you know, at least

23  minimal there was some force used and I --

24    THE COURT:  Well, no.  A bunch of them rolled out

25  to the house, and that's the key to your case; right?

1          MS. HENRIKS:  Yes.

2          THE COURT:  Yeah.

3          MS. HENRIKS:  Well, five.  And according to --

4          THE COURT:  Yeah.  And you named them in the

5    excessive force; right?

6          MS. HENRIKS:  Yes.

7          THE COURT:  And you named in the sort of

8    warrantless-arrest claim; right?

9          MS. HENRIKS:  Correct.

10          THE COURT:  Okay.  And then you named them in the

11    malicious-prosecution claim.

12          MS. HENRIKS:  No, shouldn't be.

13          THE COURT:  Well --

14          MS. HENRIKS:  I will -- I mean, I -- I'm sorry,

15    Your Honor.  If it's not clear, I like to break it down.  I

16    will correct it.  I will stipulate that they shouldn't be in

17    malicious-prosecution claim.  The officers that went --

18    Jolicoeur, for example, he shouldn't be there.  So it's --

19    you know, if counsel would have pointed my attention, I would

20    have clarified that -- or stipulate that doesn't apply to

21    them.

22          THE COURT:  Well, I guess the issue we have -- and

23    we're now turning to the request to amend the Complaint -- is

24    that -- and, really, the way I understand the City's

25    objection to the request to amend the Complaint is that the

1    Walker parties were aware of Detective Riemen's involvement

2    in the case for an extended period of time.  There was the

3    local claim procedure which listed her in 20- -- I think --

4    17 -- prior counsel, yes, but it's the Walkers -- and then,

5    basically, the core facts regarding the investigation were in

6    hand by no later than February of '19, and then some sort of

7    discussion perhaps beginning in May of '19 about amending the

8    Complaint to add Detective Riemen in some way.

9         And the concern that Ms. Hendriks raised in her

10   paper was that Rule 11 required extensive discovery of the

11   procedures at LAPD and the City Attorney's Office to

12   establish who did what in terms of withholding alleged *Brady*

13   evidence, and, in fact, that was discovery on cause of action

14   of malicious prosecution and concealment of evidence against

15   Officers Hackman, Estrada, Martinez, Jolicoeur and

16   Sergeants Henderson and Harper.

17        I got to say it feels to me like there was far less

18   of a factual basis to name all of those individuals at the

19   time of the Second-Amended Complaint than to allege a

20   plausible claim against Detective Riemen by February of 2019

21   and certainly by April or May of 2019.  Certainly, the

22   deposition may have added additional facts, and there was a

23   stay in discovery, and there was a rather unwieldy deposition

24   procedure put in based on conduct in the case, but I have

25   some real concerns about the diligence and the timing of how

1    this went down with respect to Detective Riemen.

2              MS. HENRIKS:  Your Honor, if I may address?

3              THE COURT:  You certainly may.

4              MS. HENRIKS:  I did inquire prior counsel,

5    Mr. Luna, about reasons stating Detective Riemen -- or naming

6    Detective Riemen in -- on a government claim form --

7              THE COURT:  Sure.

8              MS. HENRIKS:  -- and the reasons he stated for me,

9    I wouldn't pursue.  That's not a malicious-prosecution claim,

10   and I did not agree, and that's the reason she wasn't named.

11   So --

12             THE COURT:  Sorry.  I don't --

13             MS. HENRIKS:  He stated her name --

14             THE COURT:  Sure.

15             MS. HENRIKS:  -- for completely different reasons.

16   So in other words, it was not --

17             THE COURT:  Which was what?

18             MS. HENRIKS:  It's -- it was related to the arrest.

19   I think he didn't quite, you know, get the concept of

20   malicious prosecution.  The reasons we --

21             THE COURT:  Oh, he may have just thought she caused

22   the original arrest?

23             MS. HENRIKS:  Yes.

24             THE COURT:  I see.  Okay.

25             MS. HENRIKS:  So -- and I've had the discussion

1  with him -- without disclosing any confidential information,

2  but I disagreed with his position, and I have a little higher

3  standard for -- I just don't like naming people in complaints

4  or on claim forms, but I understand some attorneys do that

5  out of abundance of caution.  I did not based on what he

6  thought why she did something wrong that had nothing to do

7  with the malicious prosecution --

8            THE COURT:  Fair enough but --

9            MS. HENRIKS:  Yeah.

10            THE COURT:  -- but he was aware of her involvement

11  in the case.

12            MS. HENRIKS:  Yes, but he did this based on arrest.

13            THE COURT:  Yeah.  No, no --

14            MS. HENRIKS:  Yeah.

15            THE COURT:  -- and I think you're reading of the

16  claim form is consistent.

17            MS. HENRIKS:  Yeah.  And I would disagree.  I

18  wouldn't bring it -- in my judgment as an attorney, I

19  wouldn't bring -- based on what he knew at that time, I

20  wouldn't bring claim against Detective Riemen at that time.

21            THE COURT:  But you brought a claim against

22  Jolicoeur for malicious prosecution.

23            MS. HENRIKS:  I -- it's -- again, it is just -- I

24  would never pursue to trial against Mr. -- I mean,

25  Officer Jolicoeur for excessive force merely that they use

1    there during the arrest, and I will talk to my client.  Once

2    I get the authority, I probably will let the -- I will let

3    the only stronger claims to proceed to trial.

4            THE COURT:  Well, what's the strength of the claim

5    against Jolicoeur for malicious prosecution?

6            MS. HENRIKS:  Your Honor, again, it is -- probably

7    was a mistake to have generalized everybody in the caption.

8    Should have been only as to the, you know, individual --

9    well, it shouldn't -- it should be excluded.  They should

10   have been excluded from malicious-prosecution claim.  But I

11   haven't even taken his --

12           THE COURT:  They shouldn't -- no, they shouldn't

13   have been included in the first place because you have the

14   Rule 11 problem there that you claim to have been concerned

15   about later.

16           MS. HENRIKS:  They -- well, the Rule 11 -- why, I

17   mean, it's -- yes, it's handcuffing in a manner they did it.

18           THE COURT:  That's a different cause of action,

19   Ms. Henriks, and you know it.

20           MS. HENRIKS:  I understand.  I understand.

21           THE COURT:  You named these individuals twice.  You

22   have a separate cause of action for concealment of evidence

23   --

24           MS. HENRIKS:  Yes.

25           THE COURT:  -- and a separate cause of action for

1   malicious prosecution against all of the officers involved in

2   the arrest.

3            MS. HENRIKS:  And when --

4            THE COURT:  What was your Rule 11 basis for

5   including them?

6            MS. HENRIKS:  It was by error, Your Honor.

7            THE COURT:  Okay.

8            MS. HENRIKS:  It was just inadvertently -- should

9   have been clarified that they are excluded.  The officers

10  other -- you know, they should have been excluded from that

11  cause of action.  And I think -- I don't recall where it is,

12  but at some point I think I offer the stipulation to make

13  sure that we -- they're not there, but I was --

14           THE COURT:  Well, let's -- and Ms. Collins wants to

15  respond to that.

16           MS. COLLINS:  Yes, Your Honor.

17           The only stipulation that was proposed was not to

18  remove parties, was to add Detective Riemen and the City

19  prosecutor when I pointed out to Ms. Henriks that the people

20  that she had listed as to this malicious-prosecution claim

21  were not who she was discussing with me the malicious-

22  prosecution basis was, and that was the May discussion,

23  followed by the May email where Ms. Henriks indicated, based

24  on our discussion, "I would ask to amend the Complaint."  She

25  never proposed to dismiss these people.  I would certainly

1    jump at that.

2           THE COURT:  I kind of get that.

3           Did -- Ms. Henriks, did you have a discussion with

4    Ms. Collins in May of 2019 about adding a cause of action

5    against Detective Riemen?

6           MS. HENRIKS:  Yes.  I -- no, not to

7    Detective Riemen.  I needed to know whether it's -- she will

8    stipulate -- I had to add all the people involved, which

9    would be Detective Riemen and the prosecutors, because

10   whether Detective Riemen gave it to prosecutor and prosecutor

11   is the one who withheld it I had no clue because she wouldn't

12   let me take the deposition.  So I can't -- I would not have

13   --

14          THE COURT:  Right, because you don't get to conduct

15   federal court discovery unless you have a cause of action

16   that's relevant.

17          MS. HENRIKS:  Next time I will be in state court.

18   That -- state court allows you to do discovery on unpleaded

19   claims.  So unfortunately --

20          THE COURT:  Dismiss your 1983 claim, I'll let you

21   go.

22          MS. HENRIKS:  Well, no.  I -- well --

23          THE COURT:  I'll let you go.

24          MS. HENRIKS:  Well, if --

25          THE COURT:  If you want to go back to state court,

1    I'll let you go.

2           MS. HENRIKS:  Well, I may do that, although I like

3    to be here but just -- I may do that --

4           THE COURT:  I love having you but --

5           MS. HENRIKS:  But, Your Honor, the point here is I

6    think the standard that you have to have a claim in order to

7    determine who people are exactly in that chain that

8    responsible for that claim, it makes it harder and causes

9    multiple amendments.  So had you allowed me to --

10           THE COURT:  It makes it -- it may make it harder,

11    but is it the law?

12           MS. HENRIKS:  I don't believe that's the -- I

13    honestly disagree because if --

14           THE COURT:  You disagree that --

15           MS. HENRIKS:  I -- it's my honest belief, and

16    respectfully, that we should have been allowed to take the

17    deposition to know who's responsible for withholding evidence

18    and then amended appropriately so we don't have to amend in

19    abstract just to get that cause of action so then we can get

20    the deposition --

21           THE COURT:  So do you disagree that Rule 26(e)(1),

22    which talks about the scope of proper discovery -- do you

23    disagree that discovery is only relevant if it addresses

24    claims or defenses in the action?

25           MS. HENRIKS:  I agree that's the rule, but I don't

1    think that it's necessarily you are bound only to question

2    about just claims that are pleaded because it's -- anything

3    that can reasonably lead to any admissible evidence that can

4    lead to the amendment so --

5            THE COURT:  That's not the rule anymore.

6            MS. HENRIKS:  I understand.  I understand that the

7    rule is has to be proportional, it has to be --

8            THE COURT:  No, no, no.  The bit about leading to

9    discoverable -- admissible evidence was taken out of the

10   Federal Rules four years ago.

11           MS. HENRIKS:  I understand, but it's -- the

12   proportionality standard, and it also has to be -- well, if

13   it's -- you know, if that's what the reading is, then state

14   courts are more liberal allowing --

15           THE COURT:  I'm not asking you if the --

16           MS. HENRIKS:  Yeah.

17           THE COURT:  Is that the law?

18           MS. HENRIKS:  I --

19           THE COURT:  You may not agree with the law, and I

20   accept that, and I respect that and the law --

21           MS. HENRIKS:  Yes.  That's the law.  That's the

22   law.

23           THE COURT:  -- and the law in federal court may be

24   different than in state court but did -- is that an accurate

25   recitation of federal law?

1          MS. HENRIKS:  Yes.  And I think that when that four

2    years ago they enacted it, they didn't consider the fact that

3    sometimes Rule 11 compels you to do some discovery to find

4    out who the actual person is so it's going to lead to

5    multiple amendments.  So maybe they should revisit that law

6    because then now they need to liberally allow the amendments

7    because you can't just put names because you don't know --

8    you didn't get to discovery yet because you don't have the

9    claim yet, you have to have a claim first, then have more

10   details about the claim, then you're going to have to have

11   another amendment, just like in this case.

12          Because I just didn't want to -- I could have named

13   all of them.  I could have named Ann Rosenthal.  I could have

14   named every single prosecutor that I know of or I don't know

15   of but I just --

16          THE COURT:  If you had a reasonable basis in law

17   and fact based on your pre-complaint investigation.

18          MS. HENRIKS:  But I also knew the system.  I was

19   familiar with LAPD's system that left hand does not know what

20   the right hand is doing, especially in the prosecutor's

21   office.  I just didn't want to name people who didn't do

22   anything wrong.  I just personally -- the standard -- it's --

23   I read Rule 11 as --

24          THE COURT:  Well, and it's tough with police

25   parties because there is an information imbalance, and I do

1   get that.

2           MS. HENRIKS:  No.  The information is certainly not

3   readily accessible for us.

4           THE COURT:  That's what I meant by "imbalance."

5           Okay.  All right.  Okay.

6           MS. HENRIKS:  But, Your Honor, also there is no

7   prejudice.  She already been deposed.  I'm sure that she will

8   consent -- she will be represented by counsel --

9           THE COURT:  Consent to being sued?

10          MS. HENRIKS:  No.  Consent to the -- Your Honor

11  conducting -- as far as magistrate's consent.  I'm talking

12  about the --

13          THE COURT:  Oh, consenting to the case.

14          MS. HENRIKS:  Case.  Yes.

15          THE COURT:  Oh, yeah.

16          MS. HENRIKS:  Consent to the --

17          THE COURT:  I think --

18          MS. HENRIKS:  -- case being heard by Your Honor.

19          THE COURT:  I --

20          MS. HENRIKS:  So I mean that consent.  So --

21          THE COURT:  So, if Detective Riemen were to be

22  added to the case, what additional discovery, if any, would

23  you need to conduct?

24          MS. HENRIKS:  Nothing.  I have already taken her

25  deposition.

1          THE COURT:  Okay.

2          Ms. Collins?

3          MS. COLLINS:  Your Honor, I don't think we even get

4    to that analysis because we don't get past the fact that

5    there is an undue delay given the amount of time that

6    Ms. Hendriks has had this information and the fact that she

7    attempted to amend to add her but didn't because I refused to

8    stipulate to it.  I don't think we get to an analysis if

9    there's prejudice or not, we don't get to the factors on that

10   issue because we don't get past the fact that there's been no

11   evidence put forth that this is new evidence, that this is

12   not evidence that she's had for many, many months.

13          I don't even know what to say, Your Honor.  I think

14   that this is the exact argument I raised when she tried to

15   amend the First Amended to the Second Amended.  I said that

16   we're now adding these cause of action and the Court said,

17   "Well, we're not adding a new party."  So we sort of got

18   around the discussion there, and she was allowed to add it

19   because she wasn't adding a new party, and now that she's had

20   the malicious-prosecution claim added and said, "Well, it's

21   not a new cause of action.  We're just adding a new party,"

22   it's -- well, it's -- the reason you're now not adding a new

23   cause of action is because you added it in April, you didn't

24   add the appropriate parties, certainly didn't bother you

25   enough to allege malicious prosecution against Chief Beck,

 1    Detective Dunn, Sergeant Harper, Sergeant Henderson,

 2    Jolicoeur, Martinez -- none of these people.  All of those

 3    people are alleged as to malicious prosecution.  It's not

 4    just Jolicoeur, Your Honor.

 5              THE COURT:  Who is Detective Dunn?

 6              MS. COLLINS:  That's a good question, Your Honor.

 7    Detective Dunn is the individual who interviewed the

 8    Plaintiffs Walker and Tresvant the evening of the arrest.

 9              THE COURT:  Oh, I see.

10              MS. COLLINS:  That is the only involvement of

11    Detective Dunn, because he works nightshift.

12              THE COURT:  So that was obviously after the arrest?

13              MS. COLLINS:  Yes, Your Honor.

14              THE COURT:  Okay.

15              MS. COLLINS:  And yet they're still alleged in the

16    false arrest and the excessive-force claim, in the malicious-

17    prosecution claim, in the Bane Act claim.  Every single one

18    of these people were "kitchen sink" thrown in for every

19    single one of these causes of action.  I think that there is

20    a pattern here where it's not that --

21              THE COURT:  Okay.  Ms. Hendriks?

22              MS. HENRIKS:  Yes.  Why would Detective Dunn, who's

23    a watch commander, my understanding, authorize three squad

24    cars, five police officers to arrest two African-American

25    women for petty theft.  Why?  Why was that --

1          THE COURT:  Well, I can't answer that question.

2          MS. HENRIKS:  Then that's exactly why his name was

3    listed there, and the problem I have with counsel's argument

4    that you can't get information.  I did not develop clear

5    understanding, or at least clear conviction in me, that I

6    know who person is responsible is until I took the deposition

7    of Ann Rosenthal and other -- the -- two prosecutors, and I

8    believe I took the Riemen's deposition.  I then understood

9    what happened at least based on my analysis of the

10   information I got, and I couldn't done this any other way.

11   For me to have everybody named, I should have named Riemen

12   and every single prosecutor that touched this case, which is

13   I wasn't even aware of because they have assembly-line

14   system.

15          So counsel wouldn't give me information how this is

16   happened, what happened.  So she would not give me discovery

17   because I didn't have malicious-prosecution claim, but then

18   when I brought malicious-prosecution claim, which is --

19          THE COURT:  Well, I think we've agreed that that

20   was consistent with federal law.

21          MS. HENRIKS:  I understand, and that's what four

22   years ago, I guess, when they made amendments, they should

23   have considered that, you know, if you don't allow discovery,

24   sometimes then, as the discovery develops, the parties would

25   have a need to amend and have to be --

1          THE COURT:  And that's why Rule 15 and Rule 16

2     allow that in circumstances.

3          MS. HENRIKS:  I understand, and given that they've

4     brought this restriction four years ago, then they should be

5     more liberal in understanding that they can't blame parties

6     for the delay when in order to even -- we had a full stay on

7     this discovery, and I promptly moved to amend as soon as I

8     got those three depositions done.  I had developed an idea

9     what happened in this case but --

10         THE COURT:  Well, if what you're telling me is that

11    you could not properly name Detective Riemen in a malicious-

12    prosecution claim until you had completed that deposition and

13    had all those facts in hand, that is inconsistent with what

14    you did with the other officers on the other claims.

15         MS. HENRIKS:  Your Honor, the other claims were

16    pure sloppy pleading.  Rather than putting -- they should

17    have put "except defendants who merely participated in

18    arrest."  It was just mere sloppy pleading by my office, who

19    -- you know, I mean, I -- we're a small office, and it

20    happens.  I have to delegate -- because I don't type myself,

21    I have a problem typing, and you know, they have to do the

22    typing, and sometimes it's just, you know, mistake on my

23    part.  I should scrutinize everything they prepare for my

24    signature, and it's just out of 60 cases, sometimes things

25    would slip away, but I wouldn't really proceed to trial

1    against these people on withholding exculpatory evidence if

2    they had nothing to do with that.  It's honest -- it was a

3    honest mistake just in a caption.  It should have been

4    excluding them.

5        THE COURT:  Well, it's more than just the caption.

6    It's throughout the Complaint.

7        MS. HENRIKS:  But they had -- obviously, when we're

8    talking about withholding of evidence that was received or

9    surveillance, they had nothing to do with that.  I clearly --

10   in --

11       THE COURT:  It's not obvious because you've caused

12   them to be sued for that and the City Attorney to represent

13   them.

14       MS. HENRIKS:  Well, they -- they're sued for the

15   excessive force, Your Honor.  It's --

16       THE COURT:  That's you're reading of the Complaint.

17   Mine is different, and I think the City's is as well.

18       All right.  The discovery motion that I have here

19   -- I issued a brief order a few weeks ago.  This has to do

20   with the file regarding the investigation of Mr. Cardenas and

21   the accomplice, and the Walker parties asked for the entire

22   -- the entirety of the police file.  It was produced in part

23   and with redactions.  Plaintiffs have moved to compel, and

24   City requested in camera review, which I granted, and I

25   issued you an order letting you know that I just don't see --

```
 1   I don't know that I can take up issues of privilege and
 2   personal privacy and things like that.
 3           I just don't see any relevance to this material
 4   with respect to any of plaintiffs' claims whether Riemen is
 5   in the case or not, and I just don't understand why this
 6   motion was filed and what the basis for it was, and I
 7   certainly don't understand the contentions in the moving
 8   papers that this material is sort of essential and crucial
 9   and key from the Cardenas matter to the civil claims here,
10   and I just don't understand what the justification was for
11   filing this motion and saying that these documents are
12   critical to establishing plaintiffs' claim.
13           MS. HENRIKS:  May I be heard on that?
14           THE COURT:  You may.
15           MS. HENRIKS:  The Cardenas file is important is
16   because it just would show the motive for Detective Riemen in
17   withholding the surveillance video in Walker case --
18   underlying criminal case.  The fact that Mr. Cardenas is just
19   a gift for rogue detective.  He admitted to the things he
20   didn't do.  I wanted to see whether this case was ever
21   referred to the wrongful-conviction unit.  There was no
22   robbery.  That's a fact because Mr. Moran lied.  Certainly
23   not as he was exiting Cardenas didn't push him.  That didn't
24   happen.  That surveillance video was ten-times-more
25   exculpatory too for Mr. Cardenas because it would show that
```

 1    he did not act in concert with my clients.  It's -- he didn't

 2    push Mr. Cardenas, and Mr. Cardenas was lying.

 3            So that evidence, if it wasn't booked into the

 4    evidence in Mr. Cardenas's criminal file and there was never

 5    notification about this "Okay.  Well this person actually

 6    pleaded," or there was a wrongful charge and conviction, it's

 7    important because it shows the motive.  The reason Riemen

 8    would not want to give the information about the Cardenas

 9    because then in underlying, if, say, public defender in --

10    Ms. Walker's public defender, particularly, was very active

11    -- proactive, they could have gotten this.  The information

12    could gotten to Cardenas.  I don't know what stage that

13    criminal case, was but it shows the motive.  She secured

14    confession, and she wanted to keep for her stats or whatever

15    reason is --

16            THE COURT:  Am I correct that you have no idea

17    what's in the Cardenas file?

18            MS. HENRIKS:  I know that he did not commit robbery

19    and he confessed to that.

20            THE COURT:  No.  You can answer my question if it's

21    --

22            MS. HENRIKS:  Yes.

23            THE COURT:  You have no idea what's in the Cardenas

24    file?

25            MS. HENRIKS:  No.  That's why I asked the Court to

1    look.

2              THE COURT:  Right.

3              MS. HENRIKS:  Yes.

4              THE COURT:  Okay.  And the City Attorney does have

5    an idea as to what's in the file?

6              MS. HENRIKS:  Yes, but I can't just trust them.

7              THE COURT:  Okay.  Why not?

8              MS. HENRIKS:  Because I've had many cases.  They

9    cannot be trusted, Your Honor.  That's the -- we asked in

10   camera hearing so if --

11             THE COURT:  So every time an opposing lawyer

12   withholds material from production on the basis that it's not

13   relevant to the claims in the case, is that justification to

14   file a discovery motion?

15             MS. HENRIKS:  No.  What justification is --

16   particular from this opposing counsel, I started my

17   relationship on very cordial, good, cooperating terms.  First

18   thing she told me that she was told by her investigator that

19   LAPD never got the surveillance video.  I said, "Oh" -- and

20   she wanted me to dismiss the -- you know, the case against

21   City.  I said, "So you're saying you never got surveillance

22   video?"

23             "Yeah."  That's what she's telling me.

24             Then I realized that wasn't true, statement was

25   certainly misleading.  I think --

1           THE COURT:  So is the basis for your motion your

2   lack of trust of Ms. Collins?

3           MS. HENRIKS:  No.  The basis of my motion is it's

4   relevant.  Why?  Because, for example, if -- whatever is

5   produced, if I can show that the information was not given --

6   the surveillance video was not given to Mr. Cardenas's public

7   defender -- if he had any, it wasn't given to him, the

8   information about my clients, that my clients were not with

9   him, then it would be exculpatory to his robbery conviction.

10  That is important because they -- Mr. Cardenas got convicted

11  because he was with my client.  And that's why it's important

12  for me to see what happened in his criminal case.  How did he

13  convicted -- get convicted for something he did with my

14  client if they never knew each other?  And I trust my client.

15          THE COURT:  Did he plead guilty?

16          MS. HENRIKS:  I don't know.  I mean, I guess he

17  did.  Or maybe they convicted him, but that's the reason I

18  wanted information, at least for in camera, for Court to see

19  what happened in this file.  I mean, maybe Court seen what

20  happened.  I just -- it is important because it shows the

21  motive.  After all, Cardenas's robbery charge --

22          THE COURT:  So your argument is that

23  Detective Riemen -- assuming she successfully got a

24  conviction of Cardenas, your contention is that Cardenas

25  actually did not rob the store, she got an invalid

1    conviction, she may have gotten a commendation, and she has a

2    vested interest in maintaining an improper conviction against

3    Cardenas?

4              MS. HENRIKS:  Correct.

5              THE COURT:  Because she also was involved in

6    prosecuting Ms. Walker and Ms. Tresvant?

7              MS. HENRIKS:  Correct.  And --

8              THE COURT:  And there are materials in the Cardenas

9    file that the City gave to me for in camera review that

10   affirmatively show wrongful prosecution of Cardenas?

11             MS. HENRIKS:  Here why it's important:  Who --

12             THE COURT:  Did I get that right?

13             MS. HENRIKS:  My point is if -- for Mr. Cardenas's

14   case, if Mr. Carlos Moran was the witness -- main witness of

15   a robbery, then it's relevant to our case.  We want to see

16   what was the basis?  Was there a conviction?  Was there a

17   plea?  What was said, what was represented in that case

18   because --

19             THE COURT:  Why is that not a matter of public

20   record?

21             MS. HENRIKS:  Because it's not.  We tried to

22   attempt it.  I think they purged it; they're in storage.

23   We -- it's only the minutes available.

24             THE COURT:  What do the minutes show?

25             MS. HENRIKS:  It's -- nothing.  It's very limited

 1   information.

 2           So, I mean, I understand the concern that City may

 3   have, but then in camera hearing is -- that's for -- the

 4   purposes are for courts to review, to say okay, and I can

 5   explain my reasons for it, and if Court disagrees, disagrees,

 6   but I just can't take her word for it, Your Honor.  I just

 7   need to, at least, do my job to see what's in there, and it's

 8   important because it's the same witness.  This individual got

 9   convicted of crime -- I mean, if he shoplifted those gloves,

10   that's different, that's not a robbery, but he got convicted

11   of robbery that he committed along with my client --

12           THE COURT:  So Cardenas was convicted?

13           MS. HENRIKS:  Yes.

14           THE COURT:  So you do know that?

15           MS. HENRIKS:  Yes.

16           THE COURT:  Okay.

17           MS. HENRIKS:  And then who they used and what

18   evidence was -- what was given in his litigation, whether

19   there's exculpatory evidence that exculpatory for our clients

20   as well as exculpatory -- the most crucial exculpatory

21   evidence, it's Mr. Carlos Moran's lack of truthfulness.

22   Let's put it this way.

23           THE COURT:  So why -- so I don't understand the

24   argument that you needed to see the raw six-pack photos of

25   other people that were presented to Moran to identify

1   Cardenas?

2        MS. HENRIKS:  Yes.  If it's suggestive.  It was

3   suggestive or if they just already knew.  I mean, it's --

4        THE COURT:  How does that exculpate Ms. Tresvant?

5        MS. HENRIKS:  Exculpate for Tresvant?  I mean, it's

6   the motive of her -- the way she does, if she -- you know, I

7   mean, they got our clients pointed -- took them on the side

8   of the road and ID'ed them.  I mean, it's just the pattern

9   and practice.  It could be their unconstitutional practices.

10  It's -- we need to see if there's suggestive lineup, if it's

11  suggestive pack --

12       THE COURT:  I don't -- no.  I just don't

13  understand.  An unduly suggestive lineup of Cardenas which

14  occurred well after your clients have already been arrested

15  -- right?  I mean, your clients were arrested that night, and

16  the photo array that Moran saw of Cardenas was weeks later;

17  right?

18       MS. HENRIKS:  I don't recall exact when it was but

19  my -- I think the Court is missing that they all got arrested

20  for the crime that they committed together as a group as some

21  organized robbery ring.  So that's the most important thing,

22  and if the only eyewitness was lying -- and it was his

23  girlfriend, and that led me to the personal thing, Mr. --

24       THE COURT:  And if the City had in the materials

25  information about the rap sheet or other background

1  information on the individuals in the *Cardenas* case, that has

2  no plausible relevance to Ms. Walker's arrest and does not

3  appear to relate in any way to the causes of action that

4  you're pursuing, and the City Attorney reviewed it and said,

5  "This isn't relevant, and we're withholding it from

6  production."

7          MS. HENRIKS:  It would be relevant to

8  Detective Riemen's motive because if the information was

9  withheld -- "information" meaning that about Carlos Moran's

10 lack of veracity or that -- something that disprove his

11 account, how he described that as Chanda Tresvant was walking

12 out, he grabbed the purse, and then Carlos Moran shoved him.

13 If evidence --

14         THE COURT:  But you have the writeup of the

15 interview of Cardenas; correct?

16         MS. HENRIKS:  I have --

17         THE COURT:  You have the video.

18         MS. HENRIKS:  But the -- but, Your Honor, if they

19 did not give this -- or at least our clients' statement

20 saying, "We don't know who Cardenas is.  We have no idea.  We

21 weren't with him" -- if that information were not disclosed

22 in *Cardenas*'s criminal file, wouldn't that show the motive --

23         THE COURT:  You have that statement.

24         MS. HENRIKS:  Of what?

25         THE COURT:  Cardenas saying, "I don't hang out with

1    black people."

2              MS. HENRIKS:  I understand, but what I'm saying is

3    his statement that he didn't hang out with black people was

4    exculpatory for my clients --

5              THE COURT:  Right.

6              MS. HENRIKS:  -- because it shows that they

7    couldn't have been -- or at least tend to show that

8    Mr. Carlos Moran was lying.

9              THE COURT:  Yeah.

10             MS. HENRIKS:  But it's also my clients' statement

11   that they never -- they haven't been with any Hispanic male,

12   they're all alone, that would be also exculpatory for

13   Carlos Moran criminal case, and that's why I need to see the

14   file.  Is it there or not there?  If --

15             THE COURT:  Criminal case for Carlos Moran?

16             MS. HENRIKS:  I mean -- I'm sorry.  Now I got

17   everybody -- Cardenas.

18             THE COURT:  Yeah.  Cardenas.  Yeah.  Okay.

19             MS. HENRIKS:  Cardenas.

20             THE COURT:  Okay.

21             MS. HENRIKS:  So isn't it if that's deliberately

22   withheld from Cardenas's file and Cardenas got convicted of

23   something that he allegedly committed with my clients and my

24   clients said they don't know him, that would be exculpatory

25   for -- that would just establish a motive for her to just

1   conceal and separate those two cases and conceal evidence

2   from both.

3           THE COURT:  So you're suggesting that she's, like,

4   a serial *Brady* violator and she did it in Cardenas's case as

5   well as in the *Tresvant/Walker* case?

6           MS. HENRIKS:  I certainly have a right to find out

7   if she did it in Cardenas's case to --

8           THE COURT:  Okay.

9           MS. HENRIKS:  -- strengthen my case.

10          THE COURT:  Okay.  And that was the discovery

11  request you sent to the City, and the City said, "There's

12  nothing relevant here."

13          MS. HENRIKS:  I would be much comfortable if the

14  Court reviews in camera and say no, rather than taking her

15  word for it.  So -- because --

16          THE COURT:  Well, I did that.

17          MS. HENRIKS:  Yes.

18          THE COURT:  And -- Ms. Collins?

19          MS. COLLINS:  Your Honor, I'd like to point out

20  that I offered the in camera review --

21          THE COURT:  You did.

22          MS. COLLINS:  -- in lieu of a joint stipulation and

23  a discovery motion, which took an intense and insane amount

24  of time, and I offered that to maybe alleviate her concerns

25  of distrust of me as she -- as apparently that's the basis

1    for filing this motion, but I offered that, and she refused

2    it.

3           Instead, what she wanted was the complete,

4    unredacted file, and, in fact, the Exhibit 25 to Document 143

5    I state in my correspondence with her that I -- (reading)

6    While I still do not see the relevance of this information as

7    it applies to your current cases pled, I will produce a

8    redacted version of the Cardenas file given these parameters

9    by September 30th.  And the parameters were I gave her

10   everything as it related to AutoZone whether or not it

11   applied to her client.  So all of those statements that were

12   in the Cardenas file, I gave to her.

13          The only thing I redacted were things that did not

14   apply to the AutoZone incident, and she was still not okay

15   with that.  She still wanted to file a discovery motion.  She

16   completely said, "No, I'm not okay with an in camera review

17   because I don't agree with the Court's rulings thus far."

18   That was her statement.

19          MS. HENRIKS:  Where was it?  That I wanted

20   discovery because I didn't agree with the Court's ruling?

21   That -- okay.  Just -- I would like to see.

22          MS. COLLINS:  Oh, well, I'm happy to produce a

23   production of the -- or a recording of the discussion, which

24   we both have.

25          THE COURT:  No, no, no.  We're not going to get

1    into issues of the daughter with the phone and the --

2              MS. HENRIKS:  Okay.  Your Honor, the limitations

3    were imposed that the only things that counsel will produce

4    only relevant to the booking of the surveillance video.  So

5    there is limited parameters that she told that she will only

6    produce, and it would be related to the surveillance video,

7    and I wanted to see other than surveillance video was it

8    disclosed that my clients said they don't -- they did not

9    know Mr. Cardenas, was it disclosed that --

10             THE COURT:  What do you --

11             MS. HENRIKS:  my clients were arrested --

12             THE COURT:  I'm sorry.  What -- when you say "was

13   it disclosed"?

14             MS. HENRIKS:  I mean, was the evidence presented to

15   the defense in Mr. Cardenas's case.

16             THE COURT:  Was Cardenas's criminal defense lawyer

17   told --

18             MS. HENRIKS:  Got the information that --

19             THE COURT:  -- told that Ms. Walker and Tresvant

20   denied knowing Cardenas --

21             MS. HENRIKS:  Yes.

22             THE COURT:  -- and then was that information

23   contained in the Cardenas criminal file --

24             MS. HENRIKS:  Criminal file.

25             THE COURT:  -- in -- that was produced in this

1   civil litigation?

2          MS. HENRIKS:  What I wanted to know if in

3   Mr. Cardenas's criminal case, did they produce my clients'

4   statement in a police report where they denied knowing him,

5   they denied being with him, having anything to do with him

6   because that would establish motive and the reasons that this

7   detective just kept evidence away from both cases because she

8   wanted a conviction on the robbery, which is commendation --

9   whatever the motivation was.

10          THE COURT:  I got that.  I got that.

11          MS. HENRIKS:  Yeah.

12          THE COURT:  And then Ms. Collins says, "There's

13   nothing relevant here," and it gets tossed to me, and I have

14   flipped through this, and the stuff that's been withheld is

15   administrative stuff, rap sheets, you know, domestic violence

16   issues -- I mean, I'm not going to go through all of it, but

17   it's entirely unrelated to anything, and it certainly gives

18   no insight as to what was produced to a defense lawyer in the

19   *Cardenas* matter.  Okay.

20          MS. HENRIKS:  Is -- my question, Your Honor:  Is my

21   clients' statements about not knowing Mr. Cardenas included

22   in Mr. Cardenas's criminal file?  If they are, they have to

23   be because it's same case out of -- arising out of same

24   (indecipherable) facts.  It is what obligation of the

25   attorney or prosecutor should be obligation of detective

1    would be because that would be exculpatory for Mr. Cardenas's

2    criminal case.  It would show that one eyewitness that they

3    have against him is likely to be -- it would question his

4    credibility.

5              So, if the Court is representing that they did

6    disclose my clients' statement or my clients' police report

7    is part of Mr. Cardenas's file, that's fine.  I just want to

8    have some sort of verification because I think I can argue

9    that -- at trial that this is -- was a motive for her

10   withholding the evidence.

11             THE COURT:  Ms. Collins?

12             MS. COLLINS:  Your Honor, I would state that

13   Ms. Henriks has a copy of the unredacted portions which

14   include the police reports that relate to Ms. Walker and

15   Ms. Tresvant, and that's what I'm pulling up for the Bates

16   numbers, Your Honor.  And that's, of course, without even

17   getting into whether or not it's relevant --

18             THE COURT:  Okay.  Don't -- that's a different

19   issue.

20             But when is it that Ms. Tresvant or Ms. Walker or

21   both stated that they did not know Cardenas?

22             MS. HENRIKS:  In their recorded interview upon the

23   arrest.  Immediately.  I think it's the same night they say

24   that they did not know Mr. Cardenas, and it was a recorded --

25   audio recorded interview at the station, I believe.

1              THE COURT:  Okay.

2              MS. COLLINS:  Your Honor, the follow-up

3    investigations, which would be Walker -- well, starting from

4    *Walker-City* 228 all the way until --

5              THE COURT:  It's 217.  I'm -- this is the progress

6    log?

7              MS. COLLINS:  Oh, yes.

8              THE COURT:  Both Ms. Tresvant and Walker were --

9    received a *Miranda* admonition, they both waived, both denied

10   stealing any property and denied any knowledge of knowing the

11   male Hispanic or the female white or of coming to the store

12   with any other persons.  Right?

13             MS. COLLINS:  That's correct, Your Honor.

14             THE COURT:  That's the same log that was used in

15   both cases; right?

16             MS. COLLINS:  That's correct, Your Honor.  And that

17   was unredacted.

18             THE COURT:  Okay.  Plus it was produced in the --

19             MS. COLLINS:  That's correct, Your Honor.

20             THE COURT:  -- in this case?

21             MS. COLLINS:  That's correct, Your Honor.

22             THE COURT:  Okay.

23             MS. HENRIKS:  The question is was it turned over to

24   the defense -- you know, public defender in Mr. Cardenas's

25   case?

1          THE COURT:  But how is that shown by review of the

2    investigative case file?

3          MS. HENRIKS:  That's why I needed to see the -- or

4    at least Court to look at or to see the criminal file whether

5    there was any notes or indication that it was given to the

6    public defender in Cardenas's case.  Because things that

7    existed in our clients' file were not given to the public

8    defenders.  So I wanted to see if same happened in

9    Mr. Cardenas's case, his public defender didn't get the

10   information that was potentially exculpatory, just because

11   these cases are arising out of pretty much -- at least

12   Mr. Cardenas's conviction or charges out of the same

13   incident, out of same facts, same witness, same eyewitness,

14   same evidence.  I -- and I don't know where I can find that

15   information other than actually looking at the criminal file.

16   Because criminal file would have notes when they gave it to

17   the public defenders.

18          MS. COLLINS:  Your Honor, if I may?

19          THE COURT:  Yeah.

20          MS. COLLINS:  Without telling Ms. Henriks how to do

21   discovery in this case, the -- neither the Walker and

22   Tresvant criminal arrest packages nor Mr. Cardenas's arrest

23   packages are going to indicate what is or is not turned over

24   to a prosecutor and then what is or is not turned over to a

25   public defender, an APD, a criminal defense attorney.  That's

1   not what an arrest package is.

2          THE COURT:  Okay.  Let's talk scheduling.  So you

3   have a trial --

4          MS. HENRIKS:  Yes.  I, unfortunately, have to

5   represent --

6          THE COURT:  Yeah, I understand.

7          MS. HENRIKS:  And it's lot of evidence that --

8          THE COURT:  Hi.

9          Excuse me.

10         THE COURT:  Hi.  Can I help you?

11         UNIDENTIFIED MALE:  No.  I was just -- I'm okay to

12   be here or not?

13         THE COURT:  You are.

14         UNIDENTIFIED MALE:  Okay.  Just across the hall

15   wasting time.

16         THE COURT:  Ah.  Just killing time.  Well, welcome.

17         UNIDENTIFIED MALE:  Thank you.

18         THE COURT:  Time is dying here too.

19         All right.  So you have a trial in --

20         MS. HENRIKS:  March.

21         THE COURT:  Yeah.  In the --

22         MS. HENRIKS:  *McMurray v*. --

23         THE COURT:  -- the *Cochran* case?

24         MS. HENRIKS:  Yeah -- *Cochran* case.  Yeah.

25         THE COURT:  Okay.

1              MS. HENRIKS:  I believe we had Your Honor as a --

2              THE COURT:  I saw my initials on the end of that.

3              MS. HENRIKS:  Yes.

4              THE COURT:  Did I do anything on that?

5              MS. HENRIKS:  Yeah.  You did some discovery

6    motions.

7              THE COURT:  Oh, gosh.

8              MS. HENRIKS:  Denied it.

9              THE COURT:  Well, that's how it goes.

10             MS. HENRIKS:  So it's a continuation.  It's -- the

11   case got settled partially, and it's -- went back.

12             THE COURT:  Right.  And you just got an order from

13   --

14             MS. HENRIKS:  Judge Gutierrez.

15             THE COURT:  So which case is going forward?  The

16   state court or the federal court?

17             MS. HENRIKS:  It's state --

18             THE COURT:  Right.

19             MS. HENRIKS:  -- and it's general reference.  It's

20   a dissolution that involves a lot of cases that I have to

21   prepare and present to the retired judge and just --

22             THE COURT:  Right.  And you got an order, it seemed

23   like, last week of October.

24             MS. HENRIKS:  Yes.

25             THE COURT:  Because I think I saw that either in

1    your declaration or Ms. Freidenberg's.

2          And so why are you folks not able to meet and

3    confer on a trial date?

4          MS. COLLINS:  Your Honor, there's never been a

5    request to continue the trial date to either me or

6    Mr. Craigie.  The ex parte filing was the first time I, and

7    I'm assuming Mr. Craigie, heard about the request to continue

8    the trial.

9          THE COURT:  Okay.  So can I not have you go into a

10   hallway and come back and give me dates?  Well, I guess I

11   have two issues here.  If we need to move a trial date

12   because you're tied up and double-booked on an important

13   case, that's fine, and we'll find a date.  The date that

14   you've asked for, Ms. Collins informs the Court that she's

15   not available for, you know, I don't even know that I'm

16   available on that date because I got other things coming --

17   we can find a date for the trial, and we will find a date for

18   the trial, and we'll get this thing going.  Why do the other

19   dates have to move?

20         MS. HENRIKS:  It -- I -- because for the -- well,

21   it's moot at this point, Your Honor.  We've already

22   designated our expert.

23         THE COURT:  Yeah.

24         MS. HENRIKS:  So other dates are moot because we

25   just -- you know, we felt that we wanted to see what the

1  Court would rule in this -- on this motion to compel to give

2  the information to the expert, but the expert already

3  provided the report.

4          THE COURT:  Okay.

5          MS. HENRIKS:  So we already have it.

6          THE COURT:  Which is why I wanted to give you my

7  quick preliminary ruling, which was that there was just

8  nothing --

9          MS. HENRIKS:  Well, we were not -- we're not --

10 yeah.  At that point we -- we had the expert lined up.  We

11 just thought that maybe additional material will come --

12         THE COURT:  Okay.

13         MS. HENRIKS:  -- and since there are additional

14 depositions also, but I don't think that will make any

15 change, and he can also --

16         THE COURT:  So who's left to depose?  Is it --

17         MS. HENRIKS:  Henderson.

18         MS. COLLINS:  Your Honor, this is actually a great

19 question and a great segue to one of the things I wanted to

20 discuss.  The two -- well, there's three remaining

21 depositions, one which is Officer --

22         THE COURT:  By the way, does anybody need a break?

23 We've been going for a couple hours.

24         MS. HENRIKS:  No.

25         MS. COLLINS:  I'm okay, Your Honor.  If you -- if

1   the Court would like to take a break, that's fine.

2          THE COURT:  That's fine.

3          Ms. Piper?

4          THE CLERK:  I'm fine.

5          THE COURT:  Oh, good.  Okay.  Just checking.

6          MS. COLLINS:  So the remaining depositions are

7   Officer Jolicoeur, Sergeant Henderson, and Claudia Tresvant.

8   We started scheduling --

9          THE COURT:  Claudia Tresvant is?

10         MS. COLLINS:  One of the daughters of Donna Walker.

11         THE COURT:  Okay.  Yeah.  Got it.

12         MS. COLLINS:  She was at the location when --

13         THE COURT:  I see.

14         MS. COLLINS:  -- the officers arrived.

15         So we started attempting to schedule these, and

16  they were being scheduled for the 25th, which is Monday, and

17  the 26th --

18         THE COURT:  Happy Thanksgiving.

19         MS. COLLINS:  Yes.  Thank you.

20         So the discussion was Mr. -- Sergeant Henderson is

21  not local.  He lives -- presides in a different state.  So I

22  said, "Would you want to travel there, or are you going to be

23  taking it remotely?"

24         Ms. Freidenberg said, "Well, it's only an hour-long

25  deposition.  I will just take it remotely," and then they

1   followed it up with an email which says that the duration of

2   the deposition is now going to be pursuant to Federal Rule of

3   Civil Procedure 30, which is seven hours, which is in direct

4   contradiction to the Court's order of Document No. 152, and I

5   stated that the depositions were limited to one hour, and

6   there's apparently some disagreement with plaintiffs as to

7   the duration of that.  So I think that they wanted to ask to

8   get some clarification on that, despite the fact that I think

9   the order is very clear.

10          The problem is that, because they were not willing

11  to agree to the limit, I, then, cannot purchase a ticket to

12  Arizona, which is where this is, because I don't know if I

13  should get a return flight two hours later or nine hours

14  later.  So we're now at that point where it's Wednesday

15  before the Monday before the deposition, and I have no idea

16  what I'm doing in five days.

17          THE COURT:  So we have -- who was this? --

18  Henderson.  Okay.

19          Okay.  What's going on Sergeant Henderson,

20  Ms. Henriks?

21          MS. HENRIKS:  My -- I just -- Your Honor, the

22  communication that Lauren had with Ms. Badalian Collins is

23  pretty courteous, pretty accommodating, pretty cooperative

24  and I -- it was her interpretation of the order, but I told

25  her very clearly to communicate that we don't need his

1   deposition more than an hour anyways because there's nothing

2   to ask other than just reasons for --

3            THE COURT:  That's right.  Okay.  So are we agreed

4   that the deposition is an hour?

5            MS. HENRIKS:  Yes.  And I can do it remotely.  I

6   don't know why she's flying if she's telling us she can't

7   fly.  Because, if she flies, I have to fly too.

8            THE COURT:  Well, she can prepare her witness how

9   she feels, and you can --

10           MS. HENRIKS:  No, I know.  But then I --

11           THE COURT:  -- and you can question the witness how

12   you see fit.

13           MS. HENRIKS:  I -- yes.  It's one hour.  So -- and

14   the only question is I'd like to have some reasonable

15   expectation of time for Claudia Tresvant because she was only

16   at home --

17           THE COURT:  That's fine.  That's --

18           MS. HENRIKS:  -- handcuffed.  So I don't know why

19   here deposition needed for more than two hours at most.

20           THE COURT:  Agreed.

21           Ms. Collins?

22           MS. COLLINS:  Your Honor, I have no idea what

23   Ms. Tresvant is going to say.  So I would think that I should

24   be allowed the same amount of time I've taken for all of the

25   other plaintiffs who were there who did not spend time in

1   custody.  I have not taken an exorbitant amount of time, but

2   I don't think that I should be limited to two hours.

3              THE COURT:  Who are the other family members you

4   took?

5              MS. COLLINS:  Taryn Tresvant, and I believe --

6              THE COURT:  That was the young boy.  Yeah.

7              MS. COLLINS:  No.  That was the --

8              THE COURT:  Oh, I --

9              MS. COLLINS:  -- sister.

10             THE COURT:  Oh, I'm -- pardon me.

11             MS. COLLINS:  Yes.

12             THE COURT:  What was the boy's name?  Young man?

13             MS. COLLINS:  Derek.  Derek Tresvant, Jr.

14             THE COURT:  All right.  And he had some

15   developmental issues?

16             MS. COLLINS:  Yes.

17             THE COURT:  Okay.

18             MS. COLLINS:  His was much shorter.  Yes.

19             THE COURT:  That's less relevant.

20             MS. COLLINS:  Yes.

21             THE COURT:  All right.  So Taryn is the sister?

22             MS. COLLINS:  Taryn is the sister.  Yes,

23   Your Honor.

24             THE COURT:  How long was that deposition?

25             MS. COLLINS:  Hers was within two hours.  I

1  anticipate Claudia will be longer because she visited her

2  mother in jail.  So I think that there's a little bit more to

3  the discussion than Taryn, and Taryn didn't remember much.

4  So a lot of this is dependent on what they remember.

5          THE COURT:  So why is it longer because of that?

6          MS. COLLINS:  Because the damages -- the only

7  damages that they're claiming are the fact that they stayed

8  overnight in jail for that weekend, and I'd like to know the

9  discussions that she had with her mother and how those went,

10  Your Honor.  Her mother testified that the reason that her

11  stay in jail was particularly made worse and that her damages

12  are worse is based on communications that she had with

13  Claudia at the jail.

14          THE COURT:  Okay.

15          MS. COLLINS:  I don't anticipate taking very long,

16  Your Honor, but I -- I just know how -- when we say two hours

17  how that goes, and with the communications between the

18  parties and not being in court how objections can take

19  45 minutes, and I don't want that cutting into my two hours.

20          THE COURT:  Two hours.  Get to it.

21          Okay.  What else?

22          MS. HENRIKS:  Nothing else, Your Honor.  Just --

23          THE COURT:  So there are experts that have been

24  designated; correct?

25          MS. HENRIKS:  I -- we designated police practices

1    --

2         THE COURT:  Okay.

3         MS. HENRIKS:  -- expert and -- one on our side.  On

4    side of City, they designated nonretained expert to testify

5    about something that retained expert should testify, which

6    is, I guess, we'll get to that once we get into motion in

7    limine process and -- I -- Your Honor, I had to get leave.  I

8    almost face a contempt by another judge -- I mean, magistrate

9    in Riverside on a wrongful-death case.  I had to be there in

10   the morning.  I wanted to be here.  I just never thought this

11   case is going to get that far, honestly.  I just don't want

12   to abandon my clients.  Similar situation -- civil rights

13   violation is civil -- whether it's one day, two days, it

14   doesn't matter.  It's the fact that it's happening.  That's

15   why I take this kind of colloquy about this damages as this

16   is some sort of nuisance case -- I just don't see that way.

17   I don't see that way, and if the Court would look at the

18   docket on a case that I am supposed to be there in Riverside,

19   it's -- actually have similar pattern --

20        THE COURT:  And I'm sorry.  You have an appearance

21   in Riverside today?

22        MS. HENRIKS:  I supposed to, yes, and I asked -- I

23   filed to be excused to be on this case, although that case is

24   high stake, and attorneys probably would think how would

25   somebody risk not being for that case to be here.  I just

1  don't want to trivialize this case, just "Okay.  So it was

2  overnight."  They shouldn't be there and my -- I understand

3  my clients when they can't understand the malice behind it

4  why they just --

5            THE COURT:  So you filed this motion originally for

6  a hearing on the 13th.  I had to move it because of

7  scheduling issues to today, but that was a month and a half

8  ago.

9            MS. HENRIKS:  I was ordered by the magistrate last

10  minute to appear --

11            THE COURT:  Oh, I see.

12            MS. HENRIKS:  -- on a discovery dispute, and I had

13  to file ex --

14            THE COURT:  Which magistrate judge is that?

15            MS. HENRIKS:  It's Shashi --

16            THE COURT:  Kewalramani.

17            MS. HENRIKS:  Yeah.  He takes it very painfully if

18  lead attorney doesn't appear on the important thing.  Once he

19  threatened to hold me in contempt.  So this one was, like, a

20  second time, and I had to file a --

21            THE COURT:  I'm happy to call Judge Kewalramani and

22  tell him that --

23            MS. HENRIKS:  No.  He's --

24            THE COURT:  No, no -- and tell him you had a very

25  important set of motions that --

1          MS. HENRIKS:  Lauren appeared.  I did submit this

2     and --

3          THE COURT:  Okay.

4          MS. HENRIKS:  -- I guess there interpretation is

5     "This is a big wrongful death case.  Why you going on this

6     small case?"

7          But I -- if Court would just look at the pattern of

8     this case, it was same thing, desire to make shoplifting a

9     robbery, and they denied medical care, and my client's father

10    died, and I just -- you know, this is how it starts.  They --

11    it's not the fact that they spend two days.  It's the fact

12    that why they should have been prosecuted the way they got

13    prosecuted.  It's the integrity of the system and I --

14         THE COURT:  That's why we're here, and that's why

15    you're moving forward.

16         Look, we're not going to discuss all the rulings.

17    I know you're not satisfied with some of the rulings that

18    have come down.  You should be well satisfied with others,

19    and here we are, and I'm trying to get this case ready for

20    motion practice and trial and comply with my obligations

21    under the law.  What remaining expert depositions do you

22    anticipate on either side?

23         MS. HENRIKS:  I would take two nonretained expert

24    depositions that --

25         THE COURT:  And "nonretained," those are in-house

1   LAPD personnel --

2               MS. HENRIKS:  Yes.

3               THE COURT:  -- who will be testifying as experts?

4               MS. HENRIKS:  Yeah.

5               MS. COLLINS:  Yes, Your Honor.

6               THE COURT:  Are there reports being produced or no?

7               MS. COLLINS:  No, Your Honor.

8               THE COURT:  Okay.  That's --

9               MS. COLLINS:  And, Your Honor, obviously we would

10  need a discussion as to -- I mean, our position is

11  Ms. Hendriks and the plaintiffs are out of depositions, but

12  that's up to the Court to decide at this point.

13              MR. CRAIGIE:  We also have a nonretained expert as

14  well, although she's already deposed him, but obviously if

15  that's something she desires to do.

16              MS. HENRIKS:  Nonretained expert?  By who?

17              MR. CRAIGIE:  Gene Bohannan is a nonretained

18  expert.  We disclosed him.

19              MS. HENRIKS:  I've never got the designation.

20              MS. COLLINS:  I have.

21              MR. CRAIGIE:  Yeah.  We disclosed him.

22              MS. HENRIKS:  I've never got the -- well, I didn't

23  get the --

24              MR. CRAIGIE:  -- send you a copy.

25              MS. HENRIKS:  -- designation.

1          MR. CRAIGIE:  Well, I'll send you a copy.

2          MS. HENRIKS:  Okay.

3          THE COURT:  Great.  All right.  Well, keep going

4    with that.

5          MS. COLLINS:  And, Your Honor, obviously we would

6    be deposing their expert.

7          THE COURT:  Okay.  Well --

8          MS. HENRIKS:  Your Honor, is the contention is that

9    I'm not going to be allowed to take their nonretained expert

10   depositions because I thought that -- at least I can't

11   anticipate who they're going to designate.  I can't not do my

12   discovery waiting to see.  What if they designate excessive

13   numbers of witnesses?  Does it mean I --

14         THE COURT:  I mean -- Ms. Collins?

15         MS. COLLINS:  Well, Your Honor, our position is,

16   just like every other case and every other party, we all have

17   to make prior plans as to how many depositions we need,

18   accounting for the fact that we need to take expert

19   depositions.  So if that's -- you know, if I had designated

20   five or six people, maybe we'd have something to talk about,

21   but one to two experts is not unreasonable, and that's

22   something that parties have to plan for, and that's been our

23   position since the beginning.  There were plenty of

24   depositions that were taken in this case, Your Honor, that

25   were completely, completely irrelevant.  For example, they

 1   deposed the Scientific Investigation Division person.  They

 2   deposed all sorts of officers who are not relevant.  Those

 3   are decisions -- litigation decisions that need to be made.

 4           THE COURT:  You say "not relevant."  Were those the

 5   parties in the case?

 6           MS. COLLINS:  Yes, Your Honor.

 7           THE COURT:  They're kind of relevant, Ms. Collins.

 8           MS. COLLINS:  Well, except for the fact that they

 9   should never have been sued, Your Honor.

10           THE COURT:  That's a different issue --

11           MS. COLLINS:  Yes.

12           THE COURT:  -- but let's keep them together.

13           I mean, I understand the presumption under the

14   Federal Rules of whatever the maximum number is, I understand

15   the presumption about the length of time that is the outside

16   limit ordinarily, and there are also circumstances where

17   those presumptions can be, you know, overruled and overridden

18   and in a multiparty case -- maybe unreasonably multiparty is

19   the City's contention, and I get it, but we also have this

20   information imbalance from the get-go, which is, you know,

21   legitimate here.

22           I'm inclined to look favorably at a request for

23   limited additional numbers of expert depositions if you need

24   them.  I think particularly if you're -- if it's -- if it's

25   inhouse experts who are not required under Rule -- is it 26

1   or 16? -- to produce 702 report, then that's a strong factor
2   that weighs in favor of additional depositions given that the
3   opposition doesn't really know what the experts are going to
4   testify about.  So, you know -- I'm back in baby-splitting
5   mode here unfortunately.  So I would look favorably on that.
6            So we have, like -- I mean, getting back to the
7   main issue, which is scheduling, I think the schedule can and
8   probably should remain the same save for issues of when I
9   hear summary judgment motions, when I take up pretrial
10  conference and motion in limine issues, and the trial issues.
11  I understand plaintiffs coming in ex parte, particularly to
12  tee it up for me because we were going to be here for, well,
13  now 2 1/2 hours.
14           How about I hold off on that.  Since there are
15  scheduling issues that need to be discussed among all the
16  parties, I have a couple of cases that are going to
17  definitely be going to trial in the spring, including some
18  important civil rights cases involving force, and so why
19  don't I ask you to do this:  Why don't you put heads
20  together, propose a couple of series of dates for me, and
21  we'll see where we go.  I can tell you that I'm presently
22  unlikely to be available the week of April 20, I am likely
23  not available the week of April 6, because that's a big trial
24  week.
25           I'm sorry.  The trial in the Dunn matter is when?

1          MS. HENRIKS:  March 11th.

2          THE COURT:  Okay.  Well, I don't want to back too

3   much up on that.  I don't think you want to go earlier than

4   that since everything else is going.  If we push past -- eh,

5   computer.  If we pushed later, the week of April 27 I'm

6   available.  I recognize -- Ms. Collins, I think you said you

7   had a conflict the following week.  We can work around that.

8   I have sort of limited availability at the end of May, and if

9   we're looking at June, so it goes.

10          So why don't you put your heads together, give me a

11  few options when you folks reasonably think you can do

12  summary judgment hearing, which I'll hear on a Wednesday,

13  pretrial conference, and trial dates, I'll get back to you,

14  and we'll go from there.

15          MS. COLLINS:  Your Honor, we have currently expert

16  discovery cutoff of December 2nd.

17          THE COURT:  Yeah.

18          MS. COLLINS:  I was anticipating only having the

19  one deposition that we were taking of plaintiffs' expert, but

20  now if we have multiple -- three -- it would be, essentially,

21  I'm assuming, three from plaintiffs and one from ours in

22  addition to Henderson, Tresvant, and Jolicoeur -- I don't

23  know that we're going to have sufficient time to do that.

24          THE COURT:  Ms. Hendriks, would you like more time

25  for expert discovery?

1        MS. HENRIKS:  Yes, Your Honor.  I think she's

2   correct.

3        THE COURT:  See, you all can agree.

4        Mr. Craigie?

5        MR. CRAIGIE:  Oh, I have no -- I do agree.  Yes.

6   Thank you.

7        THE COURT:  All right.  You want that January 31

8   date?

9        MS. COLLINS:  Sure, Your Honor.

10        THE COURT:  Ms. Hendriks?

11        MS. HENRIKS:  Yes.  That's fine, Your Honor.

12   Although I'm starting trial on the 2nd, but that's fine.

13        THE COURT:  Of what?

14        MS. HENRIKS:  December 2nd.

15        THE COURT:  Right.  So if I -- if we extend --

16        MS. HENRIKS:  Yes.

17        THE COURT:  -- discovery to January --

18        MS. HENRIKS:  Yes.  I think it will work.

19        THE COURT:  Okay.  On the -- Mr. Craigie?

20        MR. CRAIGIE:  That works.  Thank you.

21        THE COURT:  Okay.  Then based on the agreement of

22   the parties, the expert discovery cutoff will be extended to

23   January 31 of -- do I not have a 2020 calendar on my -- I

24   don't.  Oh, wait.  Here it is.  Wow.  That's really too small

25   to read -- January 31, 2020.

1          Why don't you all gracefully meet and confer on the

2   remaining dates, send it in to me, and I'll take a look at it

3   in the next week or two.  Okay?

4          MS. COLLINS:  Yes, Your Honor.  And one last

5   question.

6          THE COURT:  Yes.

7          MS. COLLINS:  For the location of the expert depos,

8   should we just do them at a mutually agreeable location?

9          THE COURT:  Yes.

10          MS. COLLINS:  Okay.

11          THE COURT:  And everybody do your jobs.

12          Anything else?

13          Ms. Hendriks?

14          MS. HENRIKS:  No, Your Honor.  Thank you.

15          THE COURT:  Thank you.  I'll get you an order with

16   my thoughts here.

17          Ms. Collins?

18          MS. COLLINS:  That's it, Your Honor.

19          THE COURT:  Mr. Craigie?

20          MR. CRAIGIE:  Thank you, Your Honor.

21          THE COURT:  Thank you, all.  Thank you very much.

22          THE CLERK:  Court is adjourned.

23       (Proceedings adjourned at 11:39 a.m.)

24   ///

25   ///

1

2

3

4                          CERTIFICATE

5            I certify that the foregoing is a correct

6    transcript from the electronic sound recording of the

7    proceedings in the above-entitled matter.

8

9    /s/ Julie Messa              January 7, 2020
     Julie Messa, CET**D-403      Date
10   Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25